447 F.2d 1201
 CITIZENS COMMUNICATIONS CENTER et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.
HAMPTON ROADS TELEVISION CORPORATION and Community Broadcasting of Boston, Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents
WTAR Radio-TV Corporation, RKO General, Inc. (RKO) and Dudley Station Corporation, Intervenors.
CITIZENS COMMUNICATIONS CENTER et al., Appellants,
v.
Honorable Dean BURCH, Chairman, Federal Communications Commission, et al.
 No. 24471.
 No. 24491.
 No. 24221.
 United States Court of Appeals, District of Columbia Circuit.
 Argued March 15, 1971.
 Decided June 11, 1971.
 
 Mr. William A. Dobrovir, Washington, D. C., with whom Messrs. Albert H. Kramer and Robert J. Stein, Washington, D. C., were on the brief, for petitioners in No. 24,471 and appellants in No. 24,221.
 Mr. Edward P. Morgan, Washington, D. C., with whom Mr. Gerald S. Rourke, Washington, D. C., was on the brief, for petitioners in No. 24,491. Messrs. Walter H. Sweeney and Vincent B. Welch, Washington, D. C., also entered appearances for petitioners in No. 24,491.
 Mr. John H. Conlin, Associate General Counsel, Federal Communications Commission, with whom Mr. Joseph A. Marino, Counsel, Federal Communications Commission, was on the brief, for respondents in Nos. 24,471 and 24,491 and for appellees in No. 24,221. Mr. Stuart F. Feldstein, Counsel, Federal Communications Commission, and Mr. Henry Geller, General Counsel, Federal Communications Commission, at the time the record was filed, also entered appearances for respondent Federal Communications Commission in Nos. 24,471 and 24,491 and appellees in No. 24,221. Mr. Howard E. Shapiro, Atty., Department of Justice, entered an appearance for respondent United States of America in Nos. 24,471 and 24,491.
 Messrs. Harold David Cohen and James J. Freeman, Washington, D. C., were on the brief for intervenor RKO General, Inc. in No. 24,491.
 Messrs. Edgar W. Holtz, Richard S. Rodin and William A. Bradford, Jr., Washington, D. C., were on the brief for intervenor WTAR Radio-TV Corporation in No. 24,491.
 Mr. Joseph F. Hennessey, Washington, D. C., entered an appearance for intervenor Dudley Station Corporation in No. 24,491.
 Before WRIGHT, MacKINNON and WILKEY, Circuit Judges.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 Appellants and petitioners[1] in these consolidated cases[2] challenge the legality of the "Policy Statement on Comparative Hearings Involving Regular Renewal Applicants," 22 F.C.C.2d 424, released by the Federal Communications Commission on January 15, 1970, and by its terms made applicable to pending proceedings. Briefly stated, the disputed Commission policy is that, in a hearing between an incumbent applying for renewal of his radio or television license and a mutually exclusive applicant, the incumbent shall obtain a controlling preference by demonstrating substantial past performance without serious deficiencies.[3] Thus if the incumbent prevails on the threshold issue of the substantiality of his past record, all other applications are to be dismissed without a hearing on their own merits.
 
 
 2
 Petitioners contend that this policy is unlawful under Section 309(e) of the Communications Act of 1934[4] and the doctrine of Ashbacker Radio Corp. v. F. C.C., 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). The 1970 Policy Statement is also attacked by petitioners on grounds that it was adopted in disregard of the Administrative Procedure Act and that it restricts and chills the exercise of rights protected by the First Amendment.
 
 
 3
 Respondents urge the court to refrain from considering these arguments at this time because the 1970 Policy Statement is neither a final order nor yet ripe for review. In the alternative, respondents take the position that the Policy Statement is a lawful exercise of the Commission's authority.
 
 
 4
 We find that the judicial review sought by petitioners is appropriate at this time. Without reaching petitioners' other grounds for complaint,[5] we hold that the 1970 Policy Statement violates the Federal Communications Act of 1934, as interpreted by both the Supreme Court and this court.
 
 
 5
 * Petitioners argue that the 1970 Policy Statement is "final" in the primary sense of the term because no further proceedings concerning the Policy Statement are contemplated by the Commission or provided for by the Commission's rules. Respondents' position is that neither the Policy Statement nor the order denying the petitions for reconsideration are final orders within the statutory meaning of 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). They argue that the Policy Statement sets only general guidelines to be applied in future adjudicatory proceedings where applicable. We find it unnecessary to resolve this particular disagreement because, even if the Policy Statement is characterized as interlocutory, it is still reviewable at this time. Since the Policy Statement is alleged to deprive petitioners in No. 24,491 of their statutory right to a full comparative hearing under the Ashbacker doctrine, the Commission's action in issuing the Policy Statement is reviewable now. Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948); Delta Air Lines v. C.A.B., 97 U.S.App.D.C. 46, 228 F.2d 17 (1955). As this court stated in summarizing the holding of Delta Air Lines in a subsequent case, "when the Commission adopts a procedure which precludes a true comparative hearing of conflicting applications, review may be sought here without awaiting a grant of one of the applications." Midwestern Gas Transmission Co. v. F. P.C., 103 U.S.App.D.C. 360, 366, 258 F. 2d 660, 666 (1958).
 
 
 6
 Petitioners contend that the same line of cases holding an interlocutory order denying a party an Ashbacker hearing to be final for purposes of review necessarily supports the proposition that such an order is also ripe for review before completion of the contemplated hearing. Without deciding whether this proposition holds in every case, we agree that the Policy Statement is ripe for review under the test laid out in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). According to the Supreme Court in Abbott Laboratories, the ripeness of a controversy depends upon both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149, 87 S.Ct. at 1515. The Policy Statement controversy is ripe under both halves of this test. Here the Policy Statement has been administratively considered and reconsidered by the Commission. The issues before us are "purely legal."[6] Ibid. Whether the Policy Statement denies a competing applicant the full comparative hearing to which he is entitled is strictly a matter of statutory interpretation involving a comparison of the hearing procedures spelled out in the Policy Statement with the requirements of 47 U.S.C. § 309(e) and Ashbacker. Likewise, the other issues raised by petitioners and enumerated in the introduction of this opinion are also purely legal and will not be focused or clarified by further proceedings in particular cases before the Commission.
 
 
 7
 Moreover, it would work a severe hardship on petitioners for the court to withhold consideration of their appeal. The substantial financial expense[7] to which Hampton Roads and Community Broadcasting will have been put if review of their alleged denial of procedural rights is delayed is a hardship which the court may properly take into account in finding this case ripe for review. Abbott Laboratories, supra, 387 U.S. at 153-154, 87 S.Ct. 1507; City of Chicago v. Atchison, Topeka & Santa Fe R. Co., 357 U.S. 77, 84, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958). Even more important perhaps is the deadening effect the Policy Statement has had since its institution upon renewal challenges generally. By depriving competing applicants of their right to a full comparative hearing on the merits of their own applications, and by severely limiting the importance of other comparative criteria, the Commission has made the cost of processing a competing application prohibitive when measured by the challengers' very minimal chances of success. That the Policy Statement is in this sense self-executing[8] and that it has in fact served to deter the filing of a single competing application for a television renewal in over a year[9] is perhaps the most compelling factor in the court's decision to review this dispute at this time.
 
 II
 
 8
 In order to clarify not only the legal issues but also the related substantive policy considerations involved in these consolidated cases, the court will first attempt to put the present controversy in its historical context. The national effort at comprehensive regulation of broadcasting began in 1927 with the Federal Radio Act.[10] This Act was intended to insure that "the broadcasting privilege will not be a right of selfishness" but would rather "rest upon an assurance of public interest to be served."[11] To achieve this purpose the Act provided for expiration of licenses, and consequent renewal hearings, every three years.[12] At both initial and renewal licensing, applicants were to be tested by the basic standard of "public interest, convenience, or necessity,"[13] which was defined by the Federal Radio Commission in 1928 as
 
 
 9
 "a matter of comparative and not an absolute standard when applied to broadcasting stations. Since the number of channels is limited and the number of persons desiring to broadcast is far greater than can be accommodated, the Commission must deter- mine from among the applicants before it which of them will, if licensed, best serve the public."[14]
 
 
 10
 Although the Federal Communications Act does not itself establish any specific licensing criteria, the Supreme Court has noted that "[s]ince the very inception of federal regulation [of] radio, comparative considerations as to the services to be rendered have governed the application of the standard of `public interest, convenience, or necessity.'" National Broadcasting Co. v. United States, 319 U.S. 190, 217, 63 S.Ct. 997, 1009, 87 L.Ed. 1344 (1943). With the great expansion of the broadcast media after World War II, the Commission was under heavy pressure to develop specific criteria for choosing among competitors seeking licenses for the quickly diminishing number of unallocated frequencies. The criteria were developed through a series of comparative hearing decisions and were reviewed and given final statement in the Commission's 1965 Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393. The 1965 Policy Statement defines the purpose of the comparative hearing as choosing the applicant who will provide the "best practicable service to the public" and who will insure the "maximum diffusion of control of the media of mass communications." The basic criteria relating to the determination of which applicant will provide the best service to the public are listed as full-time participation in station operation by owners, proposed program service, past broadcast record, efficient use of frequency, and character. Diversification of control of the media of mass communication is elevated in the 1965 Policy Statement to a factor of primary significance; and in an effort to resolve the inherent contradiction between the goal of diversification and its tradition of according an advantage to initial applicants with past broadcasting experience, the Commission states that it will not consider a past broadcast record which is "within the bounds of average performance." Only records which demonstrate "unusual attention to the public's needs and interests" are to be given favorable consideration, since average performance is expected of all licensees.
 
 
 11
 Although the 1965 Policy Statement explicitly refrains from reaching the "somewhat different problems raised where an applicant is contesting with a licensee seeking renewal,"[15] the Communications Act itself places the incumbent in the same position as an initial applicant. Under the 1952 amendment to the Act, both initial and renewal applicants must demonstrate that the grant or continuation of a license will serve the "public interest, convenience, and necessity." The Communications Act itself says nothing about a presumption in favor of incumbent licensees at renewal hearings; nor is an inability to displace operating broadcasters inherent in government management, as is established by the fact that in its early years of regulation the Federal Radio Commission often refused to renew licenses.[16]
 
 
 12
 Nonetheless, the history of Commission decision and of the decisions of this court reflected until recently an operational bias in favor of incumbent licensees;[17] despite Commissioner Hyde's observation in his dissent to the 1965 Policy Statement that there was no rational or legal basis for its purported nonapplicability to comparative hearings involving renewals,[18] it was commonly assumed that renewal decisions would continue to be governed by policy established in the well known Hearst[19] and Wabash Valley[20] cases. These two cases, which began with the unassailable premise that the past performance of a broadcaster is the most reliable indicator of his future performance, were typical of the Commission's past renewal rulings in that their actual effect was to give the incumbent a virtually insuperable advantage on the basis of his past broadcast record per se. In Hearst the Commission ruled that the incumbent's unexceptional record of past programming performance, coupled with the unavoidable uncertainty whether the challenger would be able to carry out its program proposals, was sufficient to overcome the incumbent's demerits on other comparative criteria. And in Wabash Valley the Commission held that a newcomer seeking to oust an incumbent must make a showing of superior service and must have some preference on other comparative criteria.
 
 
 13
 Then, in the very controversial WHDH[21] case, the Commission for the first time in its history, in applying comparative criteria in a renewal proceeding, deposed the incumbent and awarded the frequency to a challenger. Indicating a swing away from Hearst and Wabash Valley, in practical if not theoretical terms, the Commission stated its intention to insure that "the foundations for determining the best practicable service, as between a renewal and a new applicant, are more nearly equal at their outset."[22] Finding that because the incumbent's programming service had been "within the bounds of the average" it was entitled to no preference, and that the incumbent was inferior on the comparative criteria of diversification and integration, the Commission awarded the license to one of the challengers.
 
 
 14
 The WHDH decision became the immediate subject of fierce attack, provoking criticism from those who feared that it represented a radical departure from previous law[23] and that it threatened the stability of the broadcast industry by undermining large financial investments made by prominent broadcasters in reliance upon the assumption that licenses once granted would be routinely renewed.[24] While the Commission's decision was still on appeal to this court, ultimately to be affirmed, the broadcast industry sought to obtain from Congress the elimination or drastic revision of the renewal hearing procedure. A bill introduced by Senator Pastore, Chairman of the Communications Subcommittee of the Senate Commerce Committee,[25] proposed to require a two-stage hearing wherein the renewal issue would be determined prior to and exclusive of any evaluation of challengers' applications. The bill provided that if the Commission finds the past record of the licensee to be in the public interest, it shall grant renewal. Competing applications would be permitted to be filed only if the incumbent's license is not renewed. Although more than 100 congressmen and 23 senators quickly announced their support, the bill was bitterly attacked in the Senate hearings by a number of citizens groups testifying, inter alia, that the bill was racist, that it would exclude minorities from access to media ownership in most large communities, and that it was inimical to community efforts at improving television programming.[26]
 
 
 15
 The impact of such citizen opposition measurably slowed the progress of S. 2004. Then, without any formal rule making proceedings,[27] the Commission suddenly issued its own January 15, 1970 Policy Statement, and the Senate bill was thereafter deferred in favor of the Commission's "compromise." The 1970 Policy Statement retains the single hearing approach but provides that the renewal issue must be determined first in a proceeding in which challengers are permitted to appear only for the limited purpose of calling attention to the incumbent's failings.[28] The Policy Statements sets forth that a licensee with a record of "substantial" service to the community, without serious deficiencies, will be entitled to renewal notwithstanding promise of superior performance by a challenger. Only upon a refusal to renew because of the incumbent's past failure to provide substantial service would full comparative hearings be held. Thus, in effect, the Policy Statement administratively "enacts" what the Pastore bill sought to do. The Statement's test for renewal, "substantial service," seems little more than a semantic substitute for the bill's test, "public interest," and the bill's two-stage hearing, the second stage being dependent on the incumbent's failing the test, is not significantly different from the Statement's summary judgment approach. The "summary judgment" concept of the 1970 Policy Statement, however, runs smack against both statute and case law, as the next section of this opinion will show.
 
 III
 
 16
 Superimposed full length over the preceding historical analysis of the "full hearing" requirement of Section 309(e) of the Communications Act[29] is the towering shadow of Ashbacker, supra, and its progeny, perhaps the most important series of cases in American administrative law. Ashbacker holds that under Section 309(e), where two or more applications for permits or licenses are mutually exclusive, the Commission must conduct one full comparative hearing of the applications.[30] Although Ashbacker involved two original applications, no one has seriously suggested that its principle does not apply to renewal proceedings as well. This court's opinions have uniformly so held, as have decisions of the Commission itself.[31]
 
 
 17
 It is not surprising, therefore, that the Commission's 1970 Policy Statement implicitly accepts Ashbacker as applicable to renewal proceedings. To circumvent the Ashbacker strictures, however, it adds a twist: the Policy Statement would limit the "comparative" hearing to a single issue — whether the incumbent licensee had rendered "substantial" past performance without serious deficiencies. If the examiner finds that the licensee has rendered such service, the "comparative" hearing is at an end and, barring successful appeal, the renewal application must be granted. Challenging applicants would thus receive no hearing at all on their own applications, contrary to the express provision of Section 309(e) which requires a "full hearing."
 
 
 18
 In Ashbacker the Commission had promised the challenging applicant a hearing on his application after the rival application was granted. The Supreme court in Ashbacker said that such a promise was "an empty thing." At least the Commission here must be given credit for honesty. It does not make any empty promises. It simply denies the competing applicants the "full hearing" promised them by Section 309(e) of the Act. Unless the renewal applicant's past performance is found to be insubstantial or marred by serious deficiencies,[32] the competing applications get no hearing at all. The proposition that the 1970 Policy Statement violates Section 309(e), as interpreted in Ashbacker, is so obvious it need not be labored.[33]
 
 
 19
 In support of its 1970 Policy Statement the Commission is reduced to reciting the usual litany that "[t]he task of choosing between various claimants for the privilege of using the air waves is essentially an administrative one" consigned by Congress to the Commission. Brief for the Commission at 30. But Congress did not give the Commission carte blanche. To protect the public it limited its mandate with the Section 309(e) "full hearing" requirement. Unless the limitation is observed, any putative exercise of the mandate is a nullity.
 
 
 20
 Early after Ashbacker this court indicated what a "full hearing" entailed. In Johnston Broadcasting Co. v. F.C.C., 85 U.S.App.D.C. 40, 45-46, 175 F.2d 351, 356-357 (1949), we explained that the statutory right to a full hearing included a decision upon all relevant criteria:
 
 
 21
 "A choice between two applicants involves more than the bare qualifications of each applicant. It involves a comparison of characteristics. Both A and B may be qualified, but if a choice must be made, the question is which is the better qualified. * * *
 
 
 22
 "* * * Comparative qualities and not mere positive characteristics must then be considered.
 
 
 23
 * * * * * *
 
 
 24
 "* * * The Commission cannot ignore a material difference between two applicants and make findings in respect to selected characteristics only. * * * It must take into account all the characteristics which indicate differences, and reach an over-all relative determination upon an evaluation of all factors, conflicting in many cases. * * *"
 
 
 25
 We, as well as the Commission,[34] have consistently applied the teaching of Johnston Broadcasting to renewal proceedings. See South Florida Television Corp. v. F.C.C., 121 U.S.App.D.C. 293, 349 F.2d 971 (1965); Community Broadcasting Corp. v. F.C.C., 124 U.S. App.D.C. 230, 363 F.2d 717 (1966). Particularly since the 1965 Policy Statement, in a comparative hearing involving a renewal application each applicant has been aware that its task is "to make the best case possible on the basis of program offering, integration, diversification, past performance and any other matters the parties asked the Commission to consider as pertaining to licensee fitness." WHDH, supra, 143 U.S.App. D.C. at 399, 444 F.2d at 857.
 
 
 26
 We do not dispute, of course, that incumbent licensees should be judged primarily on their records of past performance. Insubstantial past performance should preclude renewal of a license. The licensee, having been given the chance and having failed, should be through. CompareWHDH, supra. At the same time, superior performance should be a plus of major significance in renewal proceedings.[35] Indeed, as Ashbacker recognizes, in a renewal proceeding, a new applicant is under a greater burden to "make the comparative showing necessary to displace an established licensee." 326 U.S. at 332, 66 S.Ct. at 151. But under Section 309(e) he must be given a chance. How can he ever show his application is comparatively better if he does not get a hearing on it? The Commission's 1970 Policy Statement's summary procedure would deny him that hearing.[36]
 
 
 27
 The suggestion that the possibility of nonrenewal, however remote, might chill uninhibited, robust and wide-open speech cannot be taken lightly. But the Commission, of course, may not penalize exercise of First Amendment rights. And the statute does provide for judicial review. Indeed, the failure to promote the full exercise of First Amendment freedoms through the broadcast medium may be a consideration against license renewal. Unlike totalitarian regimes, in a free country there can be no authorized voice of government. Though dependent on government for its license, independence is perhaps the most important asset of the renewal applicant.
 
 
 28
 The Policy Statement purports to strike a balance between the need for "predictability and stability"[37] and the need for a competitive spur. It does so by providing that the qualifications of challengers, no matter how superior they may be, may not be considered unless the incumbent's past performance is found not to have been "substantially attuned" to the needs and interests of the community. Unfortunately, instead of stability the Policy Statement has produced rigor mortis.[38] For over a year now, since the Policy Statement substantially limited a challenger's right to a full comparative hearing on the merits of his own application, not a single renewal challenge has been filed.
 
 
 29
 Petitioners have come to this court to protest a Commission policy which violates the clear intent of the Communications Act that the award of a broadcasting license should be a "public trust."[39] As a unanimous Supreme Court recently put it, "It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount."[40] Our decision today restores healthy competition by repudiating a Commission policy which is unreasonably weighted in favor of the licensees it is meant to regulate, to the great detriment of the listening and viewing public.
 
 
 30
 Wherefore it is ORDERED: (1) that the Policy Statement, being contrary to law, shall not be applied by the Commission in any pending or future comparative renewal hearings; (2) that the Commission's order of July 21, 1970 denying petitioners' petition for reconsideration of the Policy Statement and refusing to institute rule making proceedings is reversed; and (3) that these proceedings are remanded to the Commission with directions to redesignate all comparative renewal hearings to which the Policy Statement was deemed applicable to reflect this court's judgment.
 
 
 
 Notes:
 
 
 [1]
 Hereinafter "petitioners."
 
 
 [2]
 Case No. 24,471 is brought by the Citizens Communications Center (CCC) and Black Efforts for Soul in Television (BEST), two nonprofit organizations organized "for the purposes of improving radio and TV service, of promoting the responsiveness of broadcast media to their local communities, of improving the position of minority groups in media ownership, access and coverage, and of generally presenting a public voice in proceedings before the FCC." They have appeared and are appearing in numerous proceedings before the Commission and in other appeals in this court from Commission rulings. These parties filed a petition pursuant to 47 U.S.C. § 402(a) and 28 U.S.C. § 2342 seeking review of (1) the Commission's Policy Statement Concerning Comparative Hearings Involving Regular Renewal Applicants, 22 F.C.C.2d 424 (1970); (2) a memorandum opinion and order by the Commission dismissing a request of CCC and BEST that it institute rule making proceedings to codify standards for all comparative proceedings, 21 F.C.C.2d 355 (1970); and (3) a memorandum opinion and order denying reconsideration of the 1970 Policy Statement and refusing to institute rule making proceedings, 24 F.C.C.2d 383 (1970)
 Case No. 24,491 is a petition for review filed by Hampton Roads Television Corporation and Community Broadcasting of Boston, Inc., two applicants for television channels who have filed in competition with renewal applicants in Norfolk, Virginia and Boston, Massachusetts. They also seek review pursuant to 47 U.S.C. § 402(a) and 28 U.S.C. § 2342 of the Commission's memorandum opinion and order denying reconsideration of the 1970 Policy Statement and refusing to institute rule making proceedings.
 Case No. 24,221 is an appeal filed pursuant to 28 U.S.C. § 1291 from an order of the United States District Court for the District of Columbia dismissing a complaint for permanent and preliminary injunction, Civil Action No. 42-70, for lack of jurisdiction. In their complaint filed January 7, 1970, CCC and BEST sought to enjoin the chairman and members of the Commission from "promulgating any policy, rule or interpretation or making any other change" in the standards applicable to comparative broadcast license renewal proceedings without first giving all interested parties notice and an opportunity to be heard pursuant to § 4 of the Administrative Procedure Act, 5 U.S.C. § 553. A temporary restraining order was denied on January 7, 1970, and following a suggestion of lack of jurisdiction made by the Commission, the District Court on January 23, 1970 dismissed the action. In light of our disposition of Cases 24,471 and 24,491, supra, this case is moot.
 RKO General, Inc. and WTAR Radio TV Corporation have both intervened in this controversy and have filed briefs defending the Policy Statement and subsequent Commission actions.
 
 
 [3]
 The Policy Statement declares:
 "* * * Promotion of [the public interest], with respect to competing challenges to renewal applicants, calls for the balancing of two obvious considerations. The first is that the public receive the benefits of the statutory spur inherent in the fact that there can be a challenge, and indeed, where the public interest so requires, that the new applicant be preferred. The second is that the comparative hearing policy in this area must not undermine predictability and stability of broadcast operation.
 * * * * *
 "We believe that these two considerations call for the following policy — namely, that if the applicant for renewal of license shows in a hearing with a competing applicant that its program service during the preceding license term has been substantially attuned to meeting the needs and interests of its area, and that the operation of the station has not otherwise been characterized by serious deficiencies, he will be preferred over the newcomer and his application for renewal will be granted. His operation is not based merely upon promises to serve solidly the public interest. He has done so. Since the basic purpose of the act — substantial service to the public — is being met, it follows that the considerations of predictability and stability, which also contribute vitally to that basic purpose, call for renewal."
 
 
 [22]
 F.C.C.2d at 424-425. (Footnote omitted.)
 
 
 [4]
 47 U.S.C. § 309. Section 309 was amended in 1952, 1960 and 1964. As summarized in a Staff Study for the Special Subcommittee on Investigations of the Committee on Interstate and Foreign Commerce, House of Representatives, 91st Cong., 2d Sess., November 1970 (hereinafter cited as Staff Study), "The Act's Legislative History reveals that the amendments dealt primarily with procedure and did not limit the hearing right of Section 309(a) discussed in Ashbacker. The 1952 amendment moved the hearing provision from subsection (a) to subsection (b). The 1960 amendment moved it to subsection (e)." Subsection (e) of § 309 today reads in pertinent part as follows:
 "If, in the case of any application to which subsection (a) of this section applies, * * * the Commission for any reason is unable to make the finding specified in such subsection, it shall formally designate the application for hearing on the ground or reasons then obtaining * * *. Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate * *."
 Subsection (a) of § 309 reads:
 "Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application."
 
 
 [5]
 Petitioners' complaint charging a violation of the APA is based on the Commission's failure to proceed by rule making rather than by issuing a policy statement. One of the purposes of rule making procedures, of course, is to make an administrative agency more aware of the wishes of the public on whose behalf it must regulate. Although it is not necessary for this court, in disposing of this case, to decide whether the Commission violated the letter of the APA in issuing the 1970 Policy Statement without first holding a public hearing, a serious question does arise as to the propriety of the Commission's action
 In order to avoid conflict with Ashbacker Radio Corp. v. F.C.C., 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), the Commission characterizes Ashbacker as dealing only with "procedure," and distinguishes the Policy Statement as being in effect substantive. Then, caught between Scylla and Charybdis, the Commission turns around and calls the Policy Statement "procedural rather than * * substantive" in order to avoid conflict with § 4 of the APA. The APA requires the Commission to follow certain procedures (notification, opportunity to file comments, etc.) in all cases of administrative "rule making." Section 2(c) of the APA, 5 U.S.C. § 551(4), defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." Section 4(a) of the APA, 5 U.S.C. § 553(a) (3) (A), however, exempts from rule making "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." The Commission argues that the January 15, 1970 Policy Statement is an exempted "general statement of policy" under § 4(a) and that it did not therefore have to be developed under the procedural safeguards described in § 4. As was said in Columbia Broadcasting System v. United States, 316 U.S. 407, 416, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942), however, it is not the label placed upon such procedures by the Commission which dictates the procedures to be followed, but rather "the substance of what the Commission has purported to do and has done which is decisive." The issue here turns on whether the January 15, 1970 Policy Statement effected a substantive change in the Commission's comparative renewal standards. And the Commission seems to have decided this issue, sub silentio at least, when it
 "reimbursed Voice of Los Angeles, Inc., for costs incurred during the initial portions of a comparative challenge to the license of KNBC, Los Angeles, essentially on the ground that [the Commission's] January 15, 1970 Policy Statement came as an unannounced surprise to Voice, and that given the change in policy it would be inequitable not to permit them to withdraw. National Broadcasting Co., Inc. (NBC), FCC 70-691 (Docket No. 18602) (released July 7, 1970). * * *"
 In Re Petitions Filed by BEST, CCC, and Others for Rulemaking To Clarify Standards in all Comparative Broadcast Proceedings, 24 F.C.C.2d 383, 388 (1970) (dissenting opinion of Commissioner Johnson). In any event, the Commission's suggestion that under the APA it can do without notice and hearing in a policy statement what Congress failed to do when the Pastore bill (see text at pages 1209-1211, infra) died in the last Congress is, to say the least, remarkable.
 
 
 [6]
 As this court stated in Environmental Defense Fund, Inc. v. Hardin, 138 U.S. App.D.C. 391, 396, 428 F.2d 1093, 1098 (1970): "The doctrines of ripeness and finality are designed to prevent premature judicial intervention in the administrative process, before the administrative action has been fully considered, and before the legal dispute has been brought into focus."
 
 
 [7]
 The expense of preparing and presenting an application is substantial, rising to as much as $250,000 for a station in a top market area. Inside the FCC: The Renewal Branch, Television Age, August 25, 1969, at 72
 
 
 [8]
 See 3 K. Davis, Administrative Law Treatise §§ 22.01 and 22.03 (1958).
 
 
 [9]
 See text at page 1214, infra.
 
 
 [10]
 44 Stat. 1162. The Radio Act of 1927, with its several amendments, was later included under Title III in the Communications Act of 1934. S.Rep.No.681, 73rd Cong., 2d Sess., at 6 (1934). According to F.C.C. v. Pottsville Broadcasting Co., 309 U.S. 134, 137, 60 S.Ct. 437, 84 L.Ed. 656 (1940), the objectives of governmental regulation remained substantially the same
 
 
 [11]
 67 Cong.Rec. 5479 (1926) (Representative White, House floor manager)
 
 
 [12]
 Federal Radio Act, § 9, 44 Stat. 1166 (1926)
 
 
 [13]
 Id. §§ 9, 11, 44 Stat. 1166, 1167. The applicability of the public interest, convenience and necessity standard to license renewal was made explicit in the Communications Act of 1934, § 307(d), which amended § 11 of the 1927 Act by adding:
 "but action of the Commission with reference to the granting of such application for the renewal of a license shall be limited to and governed by the same considerations and practice which affect the granting of original applications."
 
 
 [48]
 Stat. 1084 (1934). Perhaps to guard against the inference that an incumbent's past broadcast record could not be considered at all at renewal time, Congress in 1952 deleted the provision subjecting renewal applications to "the same considerations and practice" as original applications, substituting the provision of the 1927 Act which subjected renewal and original applications alike to the standard of "public interest, convenience and necessity."
 
 
 [14]
 Federal Radio Commission, Second Annual Report to Congress 169 (October 1, 1928). (Emphasis added.)
 
 
 [15]
 1 F.C.C.2d at 393 n. 1But see Note 23, infra.
 
 
 [16]
 Under the Radio Act, 150 AM broadcasters out of the 732 operating prior to 1927 surrendered their licenses. Even then, however, the refusal was less a result of the competition of a new applicant than of the desire to reduce the absolute number of broadcasters and the concomitant electrical interferenceSee H. Levin, Broadcast Regulation and Joint Ownership of Media 186, 198 (1960), and cases cited therein.
 
 
 [17]
 For criticism of the Commission's "rubber stamp" policy on renewals prior to its decision in WHDH, Inc., 16 F.C.C.2d 1 (1969), affirmed,sum nom. Greater Boston Television Corp. v. F.C.C. [WH DH], 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), see Cox & Johnson, Broadcasting in America and the FCC's License Renewal Process: An Oklahoma Case Study, 14 F.C.C.2d 1 (1968); and Commissioner Johnson's dissent to group renewal granted to broadcasters in Iowa and Missouri, 11 F.C.C.2d 810 (1968).
 In Chicago Federation of Labor v. Federal Radio Com'n, 59 App.D.C. 333, 41 F.2d 422 (1930), this court affirmed a Federal Radio Commission refusal to change the broadcast frequency of Station WCFL since the change would displace existing licenses. The court said:
 "It is not consistent with true public convenience, interest, or necessity, that meritorious stations * * * should be deprived of broadcasting privileges when once granted to them * * * unless clear and sound reasons of public policy demand such action. * * *"
 
 
 [50]
 App.D.C. at 334, 41 F.2d at 423. Cases such as this one established a presumption in favor of license renewals when their past broadcast record was satisfactory, and led some observers to contend, despite clear language in the Act itself requiring that a licensee expressly waive any claim to use of a frequency predicated on prior use, 47 U.S.C. § 301, that "legal rights or equities flow from a license and must be considered by the Commission in the exercise of its jurisdiction." H. Warner, Radio and Television Law 720 (1949)See also Journal Co. v. F.R.C., 60 App.D.C. 92, 48 F.2d 461 (1931); WOKO, Inc. v. F.C.C., 80 U.S.App.D.C. 333, 153 F.2d 623, reversed on other grounds, 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204 (1946). Recently, however, and before the Commission's WHDH decision, this circuit has begun to take a hard look at the presumption in favor of renewals See Note 23, infra.
 
 
 [18]
 1 F.C.C.2d at 403
 
 
 [19]
 Hearst Radio, Inc. (WBAL), 15 F.C.C. 1149 (1951)
 
 
 [20]
 Wabash Valley Broadcasting Corp. (WTHI-TV), 35 F.C.C. 677 (1963)
 
 
 [21]
 See Note 17, supra.
 
 
 [22]
 16 F.C.C.2d at 10
 
 
 [23]
 Despite the warning in the 1965 Policy Statement that it was not applicable to the "somewhat different problems" involved in renewal hearings, there were ample indications before theWHDH decision that the criteria relevant to original licensing hearings (if not the weight assigned to each such criterion) would be relevant at renewal hearings as well. In Seven (7) League Productions, Inc. (WIII), 1 F.C.C.2d 1597 (1965), for example, the Commission had decided to apply the 1965 Policy Statement to the introduction of evidence in renewal cases and to give all parties in such cases an opportunity to present arguments as to the relative weight to be accorded the various criteria. At the same time, our own court, which had in earlier cases routinely approved the renewal of incumbent licensees, expressed a concern in two cases that a renewal applicant not receive an unfair advantage by the mere fact of his prior operation of the station. See South Florida Television Corp. v. F.C.C., 121 U.S.App.D.C. 293, 349 F.2d 971 (1965), cert. denied, 382 U.S. 987, 86 S.Ct. 541, 15 L.Ed.2d 475 (1966), and Community Broadcasting Corp. v. F.C.C., 124 U.S.App.D.C. 230, 363 F.2d 717 (1966).
 Although this court affirmed the Commission's WHDH decision on the ground that WHDH was in a "special and unique category" because of its past history of inroads made upon the Commission's rules governing fair and orderly adjudication and consequent grant of a four-month temporary license to operate, we also noted:
 "* * * Although the 1965 Policy Statement did not purport to deal with the problems raised by renewal applications the Commission concluded in the same year that the policy statement properly governed the nature and scope of evidence contemplated for renewal proceedings. Seven (7) League Productions, Inc. (WIII), 1 F.C.C.2d 1597, 1598 (1965). Each applicant was aware that its task was to make the best case possible on the basis of program offering, integration, diversification, past performance and any other matters the parties asked the Commission to consider as pertaining to license fitness. As the Hearing Examiner noted, all the applicants were given the fullest opportunity to display their advantages. It is certainly not uncommon for a contender to be called on to put forward all the factors he deems favorable though he cannot be confident what absolute or relative weights will be accorded by those charged with appraisal and judgment."
 143 U.S.App.D.C. at 399, 444 F.2d at 857.
 The appropriateness of these decisions is underscored by explicit language in the Communications Act to the effect that no automatic preferential rights are intended to be extended to the renewal applicant. The Act provides, inter alia, that "no * * * license shall be construed to create any right beyond the terms, conditions, and periods of the license" (47 U.S.C. § 301); that an applicant waives any claim to a frequency "because of the previous use of the same" (47 U.S.C. § 304); that a renewal license may be granted for "a term of not to exceed three years" (47 U.S.C. § 307(d)); and that a license does "not vest in the licensee any right * * * in the use of the frequencies * * * beyond the term thereof" (47 U.S.C. § 309(h)). See also F.C. C. v. Sanders Bros. Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869 (1940):
 "The policy of the Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license. Licenses are limited to a maximum of three years' duration, may be revoked, and need not be renewed. Thus the channels presently occupied remain free for a new assignment to another licensee in the interest of the listening public.
 "Plainly it is not the purpose of the Act to protect a licensee against competition but to protect the public. * *"
 And see F.C.C. v. Pottsville Broadcasting Co., supra Note 10, 309 U.S. at 138, 60 S.Ct. 437; Ashbacker Radio Corp. v. F.C.C., supra Note 5; Transcontinental Television Corp. v. F.C.C., 113 U.S.App. D.C. 384, 386-387, 308 F.2d 339, 341-342 (1962). "[The Federal Communications Act] does not reflect the same concern for `security of certificate' that appears in other laws." WHDH, supra Note 17, 143 U.S.App.D.C. at 396, 444 F.2d at 854.
 
 
 [24]
 See, e. g., $3 Billion in Stations Down the Drain in BROADCASTING, February 3, 1969, at 19; Jaffe, WHDH: The FCC and Broadcasting License Renewals, 82 Harv.L.Rev. 1693 (1969).
 
 
 [25]
 S. 2004, 91st Cong., 1st Sess. (1969)
 
 
 [26]
 See Hearings on S. 2004 Before the Subcommittee on Communications of the Senate Committee on Commerce, 91st Cong., 1st Sess. (December 1, 1969). A New York Times article entitled "F.C.C. License Renewals: A Policy Emerges" (April 27, 1969), suggested that an analogous change in election laws would mean that no one could run for office until the incumbent had been impeached.
 For a critical scholarly analysis of S. 2004, see Comment, The Aftermath of WHDH: Regulation by Competition or Protection of Mediocrity?, 118 U.Pa.L. Rev. 368, 401-402 (1970): "[T]he Pastore Bill, in its endeavor to promote security in the broadcasting industry and to avoid irrational decision-making, would have the effect of protecting licensees rendering mediocre service and eliminating the most powerful available incentive for better broadcasting."
 
 
 [27]
 See Note 5 supra.
 
 
 [28]
 The Commission has in effect abolished the comparative hearing mandated by § 309(a) and (e) and converted the comparative hearing into a petition to deny proceeding. The petition to deny proceeding is separately provided for in the Act under § 309(d), but this section is intended to cover only those situations in which the petitioner does not seek the license himself but seeks only to prevent its award again to the incumbent
 
 
 [29]
 See Note 4, supra.
 
 
 [30]
 The primary question inAshbacker was whether an applicant for a construction permit under the Federal Communications Act is granted the hearing to which he is entitled by the Act where the Commission, having before it two applications which are mutually exclusive, grants one without a hearing and sets the other for hearing. Faced with two "actually exclusive" applications, the Commission had granted that of the Fetzer Broadcasting Company. At the same time, the Commission had designated the Ashbacker Radio Corporation application for hearing. The Commission took the position that at this hearing Ashbacker would have ample opportunity to show that its operation would better serve the public interest than would the grant of the Fetzer application and that the Fetzer grant did not preclude the Commission, at a later date, from taking any action which it found would better serve the public interest. Construing the Act, the Supreme Court stated:
 "* * * We do not think it is enough to say that the power of the Commission to issue a license on a finding of public interest, convenience or necessity supports its grant of one of two mutually exclusive applications without a hearing of the other. For if the grant of one effectively precludes the other, the statutory right to a hearing which Congress has accorded applicants before denial of their applications becomes an empty thing. We think that is the case here.
 "* * * [The procedure adopted by the Commission] is in effect to make [Ashbacker's] hearing a rehearing on the grant of the competitor's license rather than a hearing on the merits of its own application. That may satisfy the strict letter of the law but certainly not its spirit or intent.
 * * * * *
 "* * * We only hold that where two bona fide applications are mutually exclusive the grant of one without a hearing to both deprives the loser of the opportunity which Congress chose to give him."
 326 U.S. at 330-333, 66 S.Ct. at 150. (Footnote omitted.)
 
 
 [31]
 See Note 33, infra.
 
 
 [32]
 "such as rigged quizzes, violations of the Fairness Doctrine, overcommercialization, broadcast of lotteries, violation of racial discrimination rules, or fraudulent practices as to advertising." 22 F.C.C.2d at 426
 
 
 [33]
 Although the broadcast industry was perhaps less satisfied with the substantiveresult in WHDH than it had been with the results in Hearst and Wabash Valley, it should be clear from our earlier historical review that the procedure by which the Commission came to its decision was precisely the same in all three of these cases. It is true that the 1965 Policy Statement on Comparative Broadcast Hearings specifically refrained from reaching the "somewhat different problems" raised by renewal applications. But the Commission itself concluded within the same year, and consistently with its own past practice, that the same comparative criteria set out in the Statement (if not the weight assigned to each such criterion) must also be considered in renewal hearings. Seven (7) League Productions, Inc. (WIII), supra Note 23. Thus, without impinging at all upon the Commission's substantive discretion in weighing factors and granting licenses, our holding today merely requires the Commission to adhere to the comparative hearing procedure which it has followed without fail since Ashbacker and which has rightly come to be accepted by observers as a part of the due process owed to all mutually exclusive applications.
 
 
 [34]
 There are several cases cited by respondents to the effect thatno hearing need be held where an application fails to measure up to the Commission's rules and does not indicate waiver, or where one of several mutually exclusive applicants is basically unqualified. United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); Guinan v. F.C.C., 111 U.S.App.D.C. 371, 297 F.2d 782 (1961); Simmons v. F.C.C., 79 U.S.App.D.C. 264, 145 F.2d 578 (1944). Contrary to the suggestion of respondents, however, these cases in no way undercut our holding of today. Whatever the power of the Commission to set basic qualifications in the public interest and to deny hearings to unqualified applicants, the cases cited above cannot be read as authorizing the Commission to deny qualified applicants their statutory right to a full hearing on their own merits.
 
 
 [35]
 The court recognizes that the public itself will suffer if incumbent licensees cannot reasonably expect renewal when they have rendered superior service. Given the incentive, an incumbent will naturally strive to achieve a level of performance which gives him a clear edge on challengers at renewal time. But if the Commission fails to articulate the standards by which to judge superior performance, and if it is thus impossible for an incumbent to be reasonably confident of renewal when he renders superior performance, then an incumbent will be under an unfortunate temptation to lapse into mediocrity, to seek the protection of the crowd by eschewing the creative and the venturesome in programming and other forms of public service. The Commission in rule making proceedings should strive to clarify in both quantitative and qualitative terms what constitutes superior serviceSee Comment, supra Note 26, 118 U.Pa.L.Rev. at 406. Along with elimination of excessive and loud advertising and delivery of quality programs, one test of superior service should certainly be whether and to what extent the incumbent has reinvested the profit on his license to the service of the viewing and listening public. We note with approval that such rule making proceedings may soon be under way. News Notes, 39 U.S. L.Week 2513 (March 16, 1971).
 
 
 [36]
 Since one very significant aspect of the "public interest, convenience, and necessity" is the need for diverse and antagonistic sources of information, the Commission simply cannot make a valid public interest determination without considering the extent to which the ownership of the media will be concentrated or diversified by the grant of one or another of the applications before it. Johnston Broadcasting Co. v. F.C.C., 85 U.S.App.D.C. 40, 175 F.2d 351 (1949); McClatchy Broadcasting Co. v. F.C.C., 99 U.S.App. D.C. 195, 239 F.2d 15 (1956), cert. denied, 353 U.S. 918, 77 S.Ct. 662, 1 L.Ed. 2d 665, (1957); Scripps-Howard Radio v. F.C.C., 89 U.S.App.D.C. 13, 189 F.2d 677, cert. denied, 342 U.S. 830, 72 S.Ct. 55, 96 L.Ed. 628 (1951). The Supreme Court itself has on numerous occasions recognized the distinct connection between diversity of ownership of the mass media and the diversity of ideas and expression required by the First AmendmentSee, e. g., Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed. 2d 371 (1969). While it is possible under the "fairness doctrine" approved in Red Lion Broadcasting Co., supra, to insure that all stations will give time to more than one side of important and controversial issues, we reiterate the observation of this court in WHDH, supra Note 17, that:
 "The Commission need not be confined to the technique of exercising regulatory surveillance to assure that licensees will discharge duties imposed on them, perhaps grudgingly and perhaps to the minimum required. It may also seek in the public interest to certify as licensees those who would speak out with fresh voice, would most naturally initiate, encourage and expand diversity of approach and viewpoint."
 143 U.S.App.D.C. at 402, 444 F.2d at 860. As new interest groups and hitherto silent minorities emerge in our society, they should be given some stake in and chance to broadcast on our radio and television frequencies. According to the uncontested testimony of petitioners, no more than a dozen of 7,500 broadcast licenses issued are owned by racial minorities. The effect of the 1970 Policy Statement, ruled illegal today, would certainly have been to perpetuate this dismaying situation. While no quota system is being recommended or required, and while the fairness doctrine no doubt does serve to guarantee some minimum diversity of views, we simply note our own approval of the Commission's long-standing and firmly held policy in favor of decentralization of media control. Diversification is a factor properly to be weighed and balanced with other important factors, including the renewal applicant's prior record, at a renewal hearing. For two strong statements by the Commission itself on the importance of diversification, see Bamberger Broadcasting Service, Inc., 3 Pike & Fischer R.R. 914, 925 (1946), and Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 394 & n. 4 (1965).
 
 
 [37]
 The Commission's fears for the stability of the industry seem groundless in view of the fact that in the year following theWHDH opinion — that is, in the period when feared instability was greatest — only eight out of approximately 250 (or three per cent of) television license renewals were challenged. See Staff Study, supra Note 4, at 18 n. 101.
 
 
 [38]
 The recent report of the United States Commission on Civil Rights commented that the kinds of competitive proceedings eliminated under the 1970 Policy Statement are "an effective mechanism for bringing about greater racial and ethnic sensitivity in programming, nondiscriminatory employment practices, and other affirmative changes which otherwise might not take place." U.S. Commission on Civil Rights, Federal Civil Rights Enforcement Effort 283 (1971)
 
 
 [39]
 "By whatever name or classification, broadcasters are temporary permittees — fiduciaries — of a great public resource * * *." Office of Communication of United Church of Christ v. F.C.C., 138 U.S.App.D.C. 112, 117, 425 F.2d 543, 548 (1969)
 
 
 [40]
 Red Lion Broadcasting Co. v. F.C.C.,supra Note 36, 395 U.S. at 390, 89 S.Ct. at 1806.
 
 
 
 31
 MacKINNON, Circuit Judge.
 
 
 32
 I concur in the foregoing opinion. While I recognize the desire and need for reasonable stability in obtaining renewal licenses, under the present statute as construed by Ashbacker Radio Corp. v. F.C.C., 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), I do not consider it possible to provide administratively that operating licensees who furnish program service "substantially attuned to meeting the needs and interests of its area * * * [without] serious deficiencies * * * will be preferred over the newcomer and his application for renewal will be granted." Such policy would effectively prevent a newcomer applicant from being heard on the merits of his application, no matter how superlative his qualifications. It would also, in effect, substitute a standard of substantial service for the best possible service to the public and effectively negate the hearing requirements of the statute as interpreted by the Supreme Court. If such change is desired, in my opinion, it must be accomplished by amendment of the statute.