589 F.2d 578
 191 U.S.App.D.C. 55, 4 Media L. Rep. 1685
 NATIONAL BLACK MEDIA COALITION and Committee for Open Media,
San Jose, California Chapter, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
CBS, Inc., Combined Communications Corporation, et al.,
Capital Cities Communications, Inc., National Religious
Broadcasters, Inc., WPIX, Inc., Chronicle Broadcasting Co.,
et al., American Broadcasting Companies, Inc., et al.,
Dudley Station Corporation, General Electric Broadcasting
Co., Inc., San Joaquin Communications Corp., Palmer
Broadcasting Company, Central Florida Enterprises, Loyola
University and National Broadcasting Company, Inc., Intervenors.
 No. 77-1500.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 6, 1978.
Decided Oct. 13, 1978.
 
 Edward J. Kuhlmann, Washington, D. C., for petitioners.
 Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, Keith H. Fagan, Counsel, F.C.C., Barry Grossman and Daniel J. Conway, Attys. Dept. of Justice, Washington, D. C., were on the brief, for respondent.
 
 
 1
 Joseph F. Hennessey, Washington, D. C., with whom Lee G. Lovett and Richard C. Rowlenson, Washington, D. C., were on the brief, for intervenor, Dudley Station Corp., et al.
 
 
 2
 Joel Rosenbloom, Washington, D. C., with whom J. Roger Wollenberg, Sally Katzen, Washington, D. C., and Alan B. Sternstein, Rockville, Md., were on the brief, for intervenors, CBS, Inc. and Capital Cities Communications, Inc.
 
 
 3
 Robert A. Marmet and Harold K. McCombs, Jr., Washington, D. C., were on the brief, for intervenor, Loyola University.
 
 
 4
 Charles J. McKerns, Thomas H. Wall, Richard D. Marks and John R. Feore, Jr., Washington, D. C., were on the brief, for intervenor, Palmer Broadcasting Co., et al.
 
 
 5
 Frank U. Fletcher, Robert L. Heald, Edward F. Kenehan, David G. Rozzelle and Alfred C. Frawley, III, Washington, D. C., were on the brief, for intervenors, Chronicle Broadcasting Co., et al.
 
 
 6
 Also Nathan A. Bowie, Wilhelmina Reuben Cooke and Charles M. Firestone, Washington, D. C., entered appearances for petitioners.
 
 
 7
 Also Werner K. Hartenberger, Jack David Smith and John E. Ingle, Washington, D. C., counsel, Federal Communications Commission entered appearances for respondent, F.C.C.
 
 
 8
 Also J. Laurent Scharff and Jack N. Goodman, Washington, D. C., entered appearances for intervenor, Combined Communications Corp.
 
 
 9
 Also Carl R. Ramey, Washington, D. C., entered an appearance for intervenor, American Broadcasting Companies, Inc., et al.
 
 
 10
 Also John H. Midlen, Jr., Washington, D. C., entered an appearance for intervenor, National Religious Broadcasters, Inc.
 
 
 11
 Also Robert A. Beizer, Washington, D. C., entered an appearance for intervenor, WPIX, Inc.
 
 
 12
 Also Bernard Koteen, Alan Y. Naftalin and Arthur B. Goodkind, Washington, D. C., entered appearances for intervenor, NBC, Inc.
 
 
 13
 Before ROBINSON and WILKEY, Circuit Judges, and FLANNERY,* United States District Judge for the United States District Court for the District of Columbia.
 
 
 14
 Opinion for the Court filed by District Judge FLANNERY.
 
 FLANNERY, District Judge:
 
 15
 The petitioners in this case, National Black Media Coalition Et al., seek review of a Federal Communications Commission Report and Order, 66 FCC 2d 419 (1977), in which the FCC declined to adopt quantitative program standards for television broadcasters involved in comparative renewal proceedings. This court has jurisdiction to review the FCC's action under § 402(a) of the Communications Act of 1934, as amended, 47 U.S.C. § 402(a).
 
 
 16
 Under the Communications Act a broadcaster must apply for renewal of its broadcast license every three years and the FCC must review its overall performance during the preceding term and determine whether "the public interest, convenience and necessity would be served" by a renewal authorization. 47 U.S.C. § 307(d). In requiring periodic renewal, Congress also provided for a competitive spur to existing licensees by affording new parties an opportunity to apply for the same license. See 47 U.S.C. § 301; Report and Order, 66 FCC 2d at 420. It has been recognized, however, that there are "legitimate renewal expectancies" on the part of the license holders. Greater Boston Television Corp. v. FCC,[1] 143 U.S.App.D.C. 383, 396, 444 F.2d 841, 854 (1970), Cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). In order to balance the need for a competitive spur with the legitimate renewal expectancies, the FCC adopted a Policy Statement on Comparative Hearings Involving Regular Renewal Applicants ; 22 FCC 2d 424, Reconsideration denied, 24 FCC 838 (1970). Under the policy statement, a renewal applicant would be preferred over challengers if it provided substantial service with respect to the needs and interests of its service area. By Notice of Inquiry, the FCC instituted a proceeding to determine whether it should attempt to quantify the concept of substantial service. 27 FCC 2d 580 (1971). The result of that proceeding is presently under review.
 
 
 17
 In the Notice, "percentage guidelines" were proffered as Prima facie indicators of substantial service. The guidelines were:
 
 
 18
 (i) With respect to local programming, a range of 10-15% Broadcast effort (including 10-15% In the prime time period 6-11 p. m., when the largest audience is available to watch).
 
 
 19
 (ii) The proposed figure for news is 8-10% For the network affiliate, 5% For the independent VHF station (including a figure of 8-10% And 5% Respectively in the prime time period).
 
 
 20
 (iii) In the public affairs area, the tentative figure is 3-5% With, as stated, a 3% Figure for the 6-11 p. m. time period.
 
 
 21
 27 FCC 2d at 582. Although the Commission expressed the view that percentage guidelines appeared to be useful and helpful, it also indicated that Ad hoc review would still be necessary. Id. at 582-83. The FCC also indicated that the guidelines necessarily would have to be continually reviewed and revised. Id. at 583. The Commission stressed, however, that it was not committed to the percentage guideline approach and that it was still determining the feasibility of the guidelines and was open to other alternatives and suggestions. Id. at 585.
 
 
 22
 Six months after the Notice was issued this court invalidated the 1970 Policy Statement holding that the policy providing that qualifications of challengers might not be considered unless a licensee's performance was first deemed insubstantial was contrary to law. Citizens Communications Center v. FCC, 145 U.S.App.D.C. 32, 41-45, 447 F.2d 1201, 1210-14 (1971). The court recognized, however, that "licensees should be judged primarily by their past performance" and that "superior performance" should entitle the license to a "plus of major significance" in a comparative renewal proceeding. 145 U.S.App.D.C. at 44, 447 F.2d at 1213. Accordingly, the court recommended that the FCC act through rulemaking proceedings to "clarify in both quantitative and qualitative terms what constitutes superior service." 145 U.S.App.D.C. at 44 n.35, 447 F.2d at 1213 n.35. The court, however, did not imply that specific standards were required or that percentage guidelines were necessary. The matter was appropriately left to the agency's discretion in implementation.
 
 
 23
 Following the Citizens Communication Center decision, a Further Notice of Inquiry was issued by the FCC and interested parties were invited to comment on the appropriateness of the percentage figures set forth in the original notice in light of the court's decision. 31 FCC 2d 443 (1971). Two days of oral argument were held in 1972 and Second and Third Further Notice(s) of Inquiry were issued soliciting further comments. 43 FCC 2d 367, 1043 (1973). In April of 1977 the Commission issued its Report and Order, supra. The Commission concluded that it has the authority to promulgate quantitative standards for substantial service but declined to do so. 66 FCC 2d at 427.
 
 
 24
 The Commission concluded that "increasing the amount of (local and informational) programming would not necessarily improve the service a station provides its audience." Id. at 427. The FCC noted that a beneficial level of concreteness could not be obtained while allowing for the necessary degree of flexibility required. Id. at 427-28. The FCC expressed its concern that quantitative standards would restrict licensee discretion without any guarantee as to qualitative standards. Id. at 428-29. Thus, the Commission concluded that quantitative standards would not provide significantly greater certainty as to what constituted substantial service. Id. In sum, the Commission stated that quantitative standards "are a simplistic, superficial approach to a complex problem and we will not adopt them."[2] Id. at 429. For the future, the Commission indicated that it would review all elements of the renewal applicant's past performance in a comparative renewal proceeding, with a particular emphasis on the incumbent's responsiveness to the recognized problems, needs, and interests of the community. Id. at 430.
 
 
 25
 Petitioners ask this court to conclude, as a matter of law, that adoption of quantitative standards is compelled by the Communications Act and the First Amendment. Although petitioners present their case as a legal argument, they actually seek the impermissible substitution of their policy judgment for that of the Commission by this court. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); SEC v. Chenery Corp., 332 U.S. 194, 209, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); Action for Children's Television v. FCC, 183 U.S.App.D.C. 437, 457, 564 F.2d 458, 478 (1977). The standard for judicial review to be applied is whether the FCC's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This court must determine "whether the challenged action was based on 'consideration of the relevant factors' and is supported by a reasoned opinion." Action for Children's Television, supra, 183 U.S.App.D.C. at 457, 564 F.2d at 478; See Citizens to Preserve Overton Park, Inc., supra, 401 U.S. at 416, 91 S.Ct. 814. This court also must conclude that the agency's action did not exceed its statutory and constitutional authority. 5 U.S.C. §§ 706(2)(B), (C). From the record in this case it is readily apparent that the FCC action was reasonable and within its statutory and constitutional authority.
 
 
 26
 The decision not to promulgate quantitative standards was a policy judgment traditionally left to agency discretion. Nothing in the Communications Act imposes any requirement that the FCC promulgate quantitative programming standards. In granting broadcast licenses the FCC must find that the "public convenience, interest or necessity will be served thereby." 47 U.S.C. § 307(a). Within these broad confines, the Commission is left with the task of particularizing standards to be used in implementing the Act. Thus, the petitioners' claim that the FCC's decision violated the requirements of the statute is without merit.
 
 
 27
 As to petitioners' First Amendment claims, their approach would do more to subvert the editorial independence of broadcasters and impose greater restrictions on broadcasting than any duties or guidelines presently imposed by the Commission. The Act provides broadcasters with broad programming discretion and prohibits the Commission from exercising the power of censorship. 47 U.S.C. § 326; See FCC v. Pacifica Foundation, --- U.S. ----, ----, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). In interpreting the Act, the Supreme Court has held that "it seems clear that Congress intended to permit private broadcasting to develop with the widest journalistic freedom consistent with its public obligations." Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 110, 93 S.Ct. 2080, 2090, 36 L.Ed.2d 772 (1973). Petitioners claim that the lack of guidelines violates First Amendment principles because broadcasters are allegedly left to the "subjective" standards used in the Ad hoc comparative renewal proceedings. In addition to the fact that the broadcasters themselves disagree with the petitioners, it is apparent that the limitation on the broadcasters' discretion that the guidelines would cause would not be balanced by a benefit of certainty or "objective" standards in the comparative renewal process. As was indicated above, even if the percentage guidelines were adopted, an Ad hoc hearing would be required to weigh the effect of other factors in each individual case. In addition, the quantitative guidelines would limit editorial discretion without any guarantee of improved service. Thus, the Commission's decision was within its constitutional authority and quantitative standards are not required by the First Amendment.
 
 
 28
 It is readily apparent from the discussion of the Commission's decision, Supra, that the agency made a policy judgment that was within its discretion. The FCC's action was based on an adequate record and its policy judgment was fully explained in its Report and Order. 66 FCC 2d at 427-30. On the basis of the record before the court, this court must conclude that the Commission's decision concerning quantitative program standards was reasonable and not arbitrary, capricious, or an abuse of discretion.
 
 
 29
 Finally, the petitioners seek a remand of this proceeding because they claim that the FCC failed to consider an alternative whereby a licensee's performance would be judged by the extent to which it reinvested its profits "to the service of the viewing and listening public." Although the possibility of such a standard was suggested and comments were invited in the Commission's Further Notice of Inquiry, 31 FCC 2d at 44, the FCC notes that no party to the proceedings posed reinvestment as an alternative. Instead, reinvestment was suggested as a modification to the percentage guidelines program. Because the program was not adopted, the possibility of reinvestment standards was not considered as an alternative. Thus, standards concerning reinvestment of profits, as an alternative to quantitative program standards, were not raised before or considered by the Commission and therefore, the issue is not properly before this court for review. Alianza Federal de Mercedes v. FCC, 176 U.S.App.D.C. 253, 260, 539 F.2d 732, 739 (1976).
 
 
 30
 Having concluded that the FCC's action was a reasonable exercise of its discretion and not in excess of its statutory and constitutional authority, the order of the Commission challenged by National Black Media Coalition, Et al. is
 
 
 31
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to T 28 U.S.C. § 292(a)
 
 
 [1]
 In fact, the FCC has recommended to Congress that the comparative renewal process itself be abolished. See Report of the Federal Communications Commission to the Subcommittee of Communications of the Committee on Interstate and Foreign Commerce (of the House of Representatives) Re the Comparative Renewal Process, at p. 41 (November 1976)
 
 
 [2]
 This court has recently stated that a licensee's lawful renewal expectancy in the context of a comparative renewal proceeding is confined to the "likelihood that (it) will prevail in a fully comparative inquiry." Central Florida Enterprises, Inc. v. FCC, No. 76-1742, slip op. at 37 (D.C. Cir. 25 Sept. 1978)