**WLVA, INCORPORATED (WLVA–TV), LYNCHBURG, VIRGINIA, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Roanoke Telecasting Corporation (WRFT–TV), Intervenor.

No. 24702.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1971.

Decided Jan. 4, 1972.

---

Mr. Howard F. Roycroft, Washington, D.C., with whom Mr. Marvin J. Diamond, Washington, D.C., was on the brief, for appellant.

Mr. Charles M. Firestone, Counsel, Federal Communications Commission, with whom Messrs. Richard E. Wiley, Gen. Counsel, and John H. Conlin, Associate Gen. Counsel at the time the brief was filed, Federal Communications Commission, were on the brief, for appellee. Mr. Edward J. Kuhlmann, Counsel, Federal Communications Commission, also entered an appearance for appellee.

Mr. Philip M. Baker, Washington, D.C., for intervenor. Mr. Alexander N. Apostolou, Roanoke, Va., also entered an appearance for intervenor.

Before WRIGHT and TAMM, Circuit Judges, and JOHNSON,* Chief Judge, United States District Court for the Middle District of Alabama.

J. SKELLY WRIGHT, Circuit Judge:

This appeal [1] presents important and complex questions concerning the need for evidentiary hearings under Section 309 of the Communications Act of 1934, as amended, 47 U.S.C. § 309 (1970). WLVA, Incorporated (WLVA-TV), our appellant, challenges a September 9, 1970 memorandum opinion and order [2] of the Federal Communications Commission granting without a hearing the application of intervenor Roanoke Telecasting Corporation (WRFT-TV) for a construction permit to make major modifications of its UHF television facilities in Roanoke, Virginia. Specifically, WLVA-TV contends that the Commission abused its discretion in denying its requests for (1) a *Carroll* hearing [3] on WRFT-TV's application, and (2) an *Ashbacker* consolidated comparative hearing [4] on both WLVA-TV's and WRFT-TV's allegedly mutually exclusive applications. We conclude that appellant's claims for these hearings were properly denied, and therefore affirm the Commission's order.

I

Under the Commission's table of television allocations, 47 C.F.R. § 73.606 (1971), Stations WDBF-TV, WSLS-TV and WRFT-TV (UHF) operate on Channels 7, 10, and 27 respectively in Roanoke, Virginia, a city of approximately 100,000 nestled in the mountainous ter-

---

* Sitting by designation pursuant to 28 U.S. C. § 292(c) (1964).

1. Pursuant to § 402(b) of the Communications Act of 1934, as amended, 47 U.S.C. § 402(b) (1970).

2. 25 F.C.C.2d 453, 20 Pike & Fischer R.R. 2d 72 (1970).

3. Carroll Broadcasting Co. v. F. C. C., 103 U.S.App.D.C. 346, 258 F.2d 440 (1958).

4. Ashbacker Radio Corp. v. F. C. C., 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1946).

rain of western Virginia.[5] WDBJ-TV is an affiliate of the Columbia Broadcasting System and WSLS-TV is affiliated with the National Broadcasting Company. Intervenor WRFT-TV, a considerably smaller operation, began broadcasting over Channel 27 in March 1966 as a primary affiliate of the American Broadcasting Company in Roanoke. Because of the limited scope of WRFT-TV's technical facilities, however, the station has encountered continuous and substantial financial difficulties ever since its inception.[6] As a result, its impact on the existing competitive structure of the local broadcast market has been minimal.

Approximately 45 miles east of Roanoke is Lynchburg, Virginia, a community of approximately 55,000 people, where appellant WLVA-TV, serving as Lynchburg's only operating television station,[7] broadcasts on VHF Channel 13 as an affiliate of the American Broadcasting Company. Although the Commission's table of allocations treats Roanoke and Lynchburg as separate communities, the spacing is such that WSLS-TV and WDBJ-TV in Roanoke and WLVA-TV in Lynchburg can provide technically acceptable service to both communities.[8] Roanoke and Lynchburg are therefore considered a single television market (the 67th largest in the nation) by the major audience measurement firms (American Research Bureau and A. C. Nielson Company), the national television networks, national television advertisers, and the Research and Education Division of the Commission's Broadcast Bureau.[9]

As a result, WLVA-TV competes for national and regional advertising with Roanoke television stations WDBJ-TV and WSLS-TV. The technical facilities of WSLS-TV and WDBJ-TV, however, are superior to those currently employed by WLVA-TV. The two Roanoke VHF stations transmit from antennas located on Poor Mountain, situated 13 miles southwest of Roanoke, with an effective radiated power of 316 kw and an antenna height of 2,000 feet. WLVA-TV's antenna is located on Johnson Mountain, approximately 17.5 miles southwest of Lynchburg, and operates with an effective radiated power of 316 kw and an antenna height of only 1,095 feet. Thus while WDBJ-TV and WSLS-TV are able to reach 543,000 and 581,000 television homes respectively, WLVA-TV's overall coverage is 326,000, or approximately 60 per cent of that attained by the two major Roanoke stations.[10]

---

5. Roanoke also has a noncommercial UHF station allocated to it, but it is unoccupied at the present time. 47 C.F.R. § 73.606 (1971).

6. See text at note 15 infra.

7. Lynchburg also has two unoccupied UHF channels assigned to it, one of which is reserved for noncommercial use. 47 C.F.R. § 73.606.

8. Roanoke is within the predicted city grade coverage contour of WLVA–TV and Lynchburg is within the predicted city grade contour of both WSLS–TV and WDBJ–TV. Initial Decision of Hearing Examiner Chester F. Naumowicz, Jr., In re Application of WLVA, Incorporated, Docket No. 18405, File No. BPCT–3880, released Nov. 28, 1969 (hereinafter cited as "Initial Decision"), at ¶¶ 6 & 57, JA 64, 84–85 ("JA ——" references are to the Joint Appendix of materials from the record before the Commission) ; testimony of Thomas N. Waller, WLVA–TV Exhibit No. 3, In re Application of WLVA, Inc., supra (hereinafter cited as "Waller Testimony"), JA 18–19. The reception of WLVA–TV in most of Roanoke, however, is generally of weaker Grade A or Grade B strength. Thus while NBC and CBS each has one affiliate to cover both Roanoke and Lynchburg, ABC has 2 affiliates in the area— appellant WLVA–TV in Lynchburg and intervenor WRFT–TV in Roanoke.

9. Testimony of Martin E. Goldberg, WLVA–TV Exhibit No. 7, In re Application of WLVA, Inc., supra note 8 (hereinafter cited as "Goldberg Testimony"), JA 35–36; Waller Testimony, JA 16; Initial Decision at ¶ 5, JA 64.

10. Moreover, on the basis of statistical data compiled by ARB in March 1967 it appears that WLVA–TV was credited with a net weekly circulation of 154,000 television homes, as compared with the 293,- 100 and 279,700 homes credited to WSLS– TV and WDBJ–TV respectively. This disparity in weekly circulation is reflected

Despite this situation, however, WLVA-TV managed to garner a modest yet consistent profit until 1966. In that year the Evening Star Broadcasting Company, which had purchased the station in 1965 and transferred it to a wholly-owned subsidiary in 1966, made two decisions intended to improve WLVA-TV's competitive position *vis-à-vis* its Roanoke competitors. First, the Evening Star made sizable capital outlays and incurred sharply increased operating costs in an effort to upgrade the station's physical plant and technical equipment and to improve its public service programming.[11] Initially, these increased expenditures produced substantial net operating losses and negative cash flows,[12] but as the beneficial effects of these improvements began to take root, revenues gradually increased with the result that WLVA-TV's cash flow has increased from a negative $19,228 in 1967 to a positive $48,677 in 1968, and 9.1 per cent of total revenues in 1969.

On November 4, 1966, the Evening Star launched the second part of its drive to improve WLVA-TV's competitive standing in the Roanoke-Lynchburg market. On that date, WLVA-TV applied to the Commission for authority to move its facilities 17.5 miles to the northwest, to raise its antenna 1,250 feet, and for waiver of the Commission's spacing requirements.[13] The proposed transmitter site would be located atop Flat Top Mountain, 17.4 miles from Roanoke and 27.9 miles from Lynchburg. If granted, this modification would enable WLVA-TV to improve its existing signal over the areas it presently serves as well as to extend its Grade B coverage to reach a sizable audience west of Roanoke not presently served by the Lynchburg station.

WLVA-TV's application was opposed by WRFT-TV in Roanoke, by permittees of two Charlottesville UHF stations, and by the Association of Maximum Service Telecasters, Inc. The matter was designated for hearing on nine issues, including "whether a grant of the application would impair the ability of authorized and prospective UHF television broadcast stations in the area to compete effectively, or would jeopardize, in whole or in part, the continuation of existing UHF television service." WLVA, Inc., 15 F.C.C.2d 757, 764 (1968). On November 24, 1969, the hearing examiner issued his initial decision [14] in which he recommended denial of WLVA-TV's application. The examiner concluded that a grant would have an adverse impact on WRFT-TV and that such impact would be detrimental to the public interest.

---

11. Since 1965 some $400,000 has been spent in upgrading the station's physical facilities, and operating costs between 1966 and 1967 were increased by $350,000 per year. Initial Decision at ¶ 7, JA 65.

in the stations' network base hourly rates, which are $350, $755 and $900 for WLVA–TV, WDBJ–TV and WSLS–TV respectively. Waller Testimony, JA 17; Initial Decision at ¶ 7, JA 65.

Due in part to the disparity in technical facilities, WLVA–TV has not fared overly well in its competition with its VHF rivals. The total broadcast revenue and the national-regional advertising revenues for the Roanoke-Lynchburg market were, respectively, for 1967: $3,598,496 and $1,427,063; for 1966: $3,524,115 and $1,359,239; and for 1965: $3,357,477 and $1,398,891. WLVA–TV's share of the total broadcast revenues for the market was $517,555 in 1967; $432,097 in 1966; and $427,572 in 1965. WLVA–TV's share of the national and regional advertising revenues was $104,818 in 1967; $73,936 in 1966; and $76,486 in 1965. Waller Testimony, JA 16–17; Initial Decision at ¶ 7, JA 65.

12. In 1966 WLVA–TV suffered a net operating loss of $148,408, with a cash flow loss of $16,274; the corresponding losses for 1967 were $164,323 and $19,228; and in 1968 there was a loss of $106,034, although a positive cash flow of $48,677 resulted. *Ibid.*

13. Section 73.610 of the Commission's rules, 47 C.F.R. § 73.610 (1971), provides that applications for changes in transmitter sites will not be accepted for filing unless the proposed site would be at least the minimum distance from co-channel and adjacent channels as specified in the rules. The minimum distance for VHF co-channel assignments in Zone I is 170 miles. 47 C.F.R. § 73.610(b) (1).

14. *See* JA 61–91.

Exceptions were filed and the matter is presently pending before the Commission's Review Board.

Meanwhile, on June 10, 1969, intervenor WRFT-TV applied to the Commission for modification of its own facilities. Roanoke Telecasting Corporation was organized in 1965 to establish WRFT-TV as an affiliate of the American Broadcasting Company in Roanoke. WRFT-TV commenced operations in March 1966 and was granted an hourly network rate of $75 based on predicted ultimate delivery of 10,000 to 18,000 prime time homes. Because of the modest nature of WRFT-TV's technical facilities, however, the station failed even to approach its projected coverage and the hourly network compensation was therefore discontinued in November 1967 when WRFT-TV was delivering only 1,000 prime time homes. The station's financial picture is dismal. WRFT-TV suffered a net cash loss of $41,397 during the first year of operation, $46,729 in 1967, and $52,740 for the first eight months of 1968. By June 1969 the station had lost over $200,000 and the indebtedness has since swelled to over $450,000 and is increasing at the rate of $10,000 per month.[15]

In an effort to rectify this situation, WRFT-TV filed its application with the Commission to expand its technical facilities and to move its transmitter to Poor Mountain, the location of WDBJ-TV and WSLS-TV. WRFT-TV presently operates at a site six miles west of Roanoke with an effective radiated power of 21.4 kw and an antenna height of 410 feet. In its application, it proposes to broadcast with an effective radiated power of 250 kw and an antenna height of 2,010 feet, increases of 228.6 kw and 1,600 feet respectively. The new facilities would enable WRFT-TV to cover 46 per cent of the homes able to receive UHF service in the Roanoke-Lynchburg market, with the result that WRFT-TV would duplicate WLVA-TV's ABC network programming in approximately an additional 25 per cent of WLVA-TV's present coverage area.[16]

On July 16, 1969, WLVA-TV filed a petition in support of WRFT-TV's application or in the alternative a petition to deny,[17] arguing that "the public interest compels the grant of both its application and the application of WRFT-TV."[18] Because of the detrimental competitive impact a grant of only WRFT-TV's application allegedly would have on WLVA-TV, however, WLVA-TV urged that "should the Commission deny its application, the application of WRFT-TV must also be denied."[19] To support its petition, WLVA-TV incorporated by reference relevant portions of the evidentiary record compiled in the hearing on its own application. It did not, however, submit additional data to substantiate its claim that a *Carroll* hearing should be held to determine whether the competitive effect of a grant of WRFT-TV's application would cause an overall derogation of service to the public.

After issuance of the hearing examiner's initial decision on WLVA-TV's own application,[20] appellant filed another petition with the Commission requesting consolidation of consideration of WRFT-TV's application with its own on the ground of alleged economic mutual exclusivity of the two applications. WLVA-TV contended that it would be

15. Initial Decision at ¶¶ 11–13, 45, JA 67–68, 80; Affidavit of Alexander N. Apostolou, July 14, 1970, JA 106.

16. Engineering testimony of Robert E. L. Kennedy, Roanoke Telecasting Corp., Exhibit No. 2, Figure 3, In re Application of WLVA, Inc., *supra* note 8, JA 32–33.

17. WLVA–TV had earlier indicated it would not oppose WRFT–TV's application. Reply to Oppositions to Motion for Enlargement of Issues, In re Application of WLVA, Inc., *supra* note 8, ¶ 9, JA 5. WLVA–TV later changed its mind, however. Transcript of hearing, In re Application of WLVA, Inc., *supra* note 8, June 9, 1969, JA 6.

18. JA 41.

19. *Ibid.*

20. *See* text at note 14 *supra.*

denied its *Ashbacker* rights unless this petition was granted.

The Commission, in a memorandum opinion and order released September 9, 1970,[21] found that WLVA–TV had not pleaded sufficient factual data to raise a *Carroll* issue and that a consolidated comparative hearing was not required. Accordingly, the Commission, without hearing, granted WRFT–TV's application and denied WLVA–TV's petition to deny and petition for consolidation. This appeal ensued.

## II

Appellant WLVA–TV contends first on this appeal that the Commission erred in denying its request for a *Carroll* hearing to determine whether the economics of the situation would be so affected by a grant of WRFT–TV's application as to lead to an overall degradation of service to the public. The *Carroll* issue has created a "tricky terrain" upon which Congress, the courts and the Commission have wrestled for well over a decade in an effort to achieve a reasonable accommodation of several important yet competing interests. Southwestern Operating Co. v. F. C. C., 122 U.S.App.D.C. 137, 138, 351 F.2d 834, 835 (1965). The law in this area has reached its present posture through a gradual process of evolution, and it may therefore be useful to trace briefly this historical development as an aid to understanding the precise questions presented on this appeal.

## A

The starting point of our analysis must of course be the Supreme Court's landmark decision in F. C. C. v. Sanders Brothers Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940). In *Sanders Brothers* the Court held that since the Communications Act was neither intended nor designed to protect licensees against competition, "resulting economic injury to a rival station is not, in and of itself, * * * an element the [Commission] must weigh * * * in passing on an application for a broadcasting license."[22] The Court went on to note, however, that such competition is not to be disregarded entirely by the Commission, for in certain instances it may become so ruinous as to cause not only financial hardship to the complaining station, but also an overall degradation of service to the public. Indeed, increased competition "may have a vital and important bearing upon the ability of the applicant adequately to serve his public; it may indicate that both stations—the existing and the proposed—will go under, with the result that a portion of the listening public will be left without adequate service; it may indicate that, by a division of the field, both stations will be compelled to render inadequate service." 309 U.S. at 476, 60 S.Ct. at 698. In situations such as these, the Court concluded, the effect of competition is a proper consideration for the Commission in effectuating its licensing policy.

Despite *Sanders Brothers*, however, the Commission adopted a licensing policy premised on the theory that competition could not be adverse to the public interest. The assumption underlying this policy stemmed from practical considerations, for the Commission apparently believed that the possible adverse effects on public service due to overzealous competition were simply *too speculative for proof*. *See, e. g.*, Southeastern Enter-

---

21. 25 F.C.C.2d 453, 20 Pike & Fischer R.R.2d 72 (1970).

22. 309 U.S. at 473, 60 S.Ct. at 696. Initially, the Commission had been directed by the courts to deny applications for broadcast licenses when the competitive effect of a new station would impair the ability of an existing station to serve the public, even though the proposed station might offset this loss of service. *See, e. g.*, Tri-State Broadcasting Co. v. F. C. C., 71 App.D.C. 157, 107 F.2d 956 (1939); Yankee Network, Inc. v. F. C. C., 71 App.D.C. 11, 107 F.2d 212 (1939); Great Western Broadcasting Ass'n v. F. C. C., 68 App.D.C. 119, 94 F.2d 244 (1937). *Sanders Brothers* reversed this view, however.

prises, 22 F.C.C. 605, 13 Pike & Fischer R.R. 139 (1957); Montana Network, 14 F.C.C. 1179, 6 Pike & Fischer R.R. 445 (1950); Voice of Cullman, 14 F.C.C. 770, 6 Pike & Fischer R.R. 164 (1950). As a result, the concept of economic injury as an aspect of the public interest gradually slipped from view.

Then, in Carroll Broadcasting Co. v. F. C. C., 103 U.S.App.D.C. 346, 258 F.2d 440 (1958), relying heavily upon the Supreme Court's earlier decision in *Sanders Brothers*, this court reversed the Commission's position, ruling that while economic injury to an existing station is not in and of itself a matter of public concern, it becomes vital when, on the facts of the case, it spells diminution or destruction of overall service. Specifically, *Carroll* held that "when an existing licensee offers to prove that the economic effect of another station would be detrimental to the public interest, the Commission should afford an opportunity for presentation of such proof and, if the evidence is substantial (*i. e.*, if the protestant does not fail entirely to meet his burden), should make a finding or findings." [23] Although *Carroll* definitively established the relevance of economic injury to the public interest and made it incumbent upon the Commission to consider this factor in administering the Act, it did not determine how detailed the protesting licensee's offer of proof must be in order to entitle him to a hearing. *See* KGMO Radio-Television, Inc. v. F. C. C., 119 U.S.App.D.C. 1, 336 F.2d 920 (1964).

The initial Commission response to *Carroll* was to set for hearing any case where the protestant alleged the economic injury question and offered to prove that the public interest would be adversely affected. *See, e. g.*, Video Independent Theatres, Inc., 24 F.C.C. 403, 17 Pike & Fischer R.R. 149 (1958); Herbert P. Michels, 17 Pike & Fischer R.R. 557 (1958). The Commission established no pleading guidelines in these cases, but apparently gave the protestant

the benefit of the doubt whenever possible. Due to the ease with which these hearings were granted, however, this policy soon proved to be a markedly inefficient use of the Commission's limited time and energy.

The next development came from neither the Commission nor the courts but, rather, from Congress. In 1960 Congress amended the Communications Act and, in so doing, created the device of the petition to deny. 74 Stat. 889, amending 47 U.S.C. § 309. The statute provides that where a petition to deny is filed, it must "contain specific allegations of fact sufficient to show * * * that a grant of the application would be prima facie inconsistent with [the public interest, convenience and necessity] * * *." 47 U.S.C. § 309(d) (1). If "there are no substantial and material questions of fact and * * * a grant of the application would be consistent with [the public interest] * *," the petition shall be denied and the grant made without hearing. 47 U.S.C. § 309(d) (2).

The 1960 amendments were in large part a congressional response to the liberality with which the Commission had granted hearings in the past. The new, more rigorous provisions were considered a "marked improvement over the existing statutory provision * * * which [had] been interpreted by the Commission to permit allegations to be made on information and belief." The amendments were aimed at avoiding "serious and disruptive procedural abuses." H.R. Rep. No. 1800, 86th Cong., 2d Sess., 11 (1960), U.S.Code Cong. & Admin.News 1960, p. 3516. Moreover, Congress clearly intended that petitions to deny filed under Section 309(d) must make "a substantially stronger showing of greater probative value than [was previously] necessary in the case of a post-grant protest. The allegation of ultimate, conclusionary facts or mere general allegations on information and belief, supported by generalized affidavits, as [was previous-

23. 103 U.S.App.D.C. at 349, 258 F.2d at 443.

**1294**

ly] possible with protests, are not sufficient." S. Rep. No. 690, 86th Cong., 1st Sess., 3 (1959).

The Commission's reaction to the 1960 amendments, while not immediate,[24] was quite definite. In late 1962, the Commission began requiring petitioners to plead a *prima facie* case of injury to the public before it would set a hearing.[25] In implementing this policy, however, the Commission failed to specify in reasonably precise terms the type and amount of information necessary to entitle a petitioner to an evidentiary hearing on the *Carroll* issue.

This notice problem was confronted for the first time by this court in KGMO Radio-Television, Inc. v. F. C. C., *supra*, in which we reversed a Commission order denying a *Carroll* hearing because the petitioner had failed to plead sufficient factual data to make out a *prima facie* case. While noting that it was

within the Commission's authority to require more information than the petitioner offered, we held that since he had "no notice * * * that more would be required, the petition should not [have been] denied on the ground that more was not furnished." 119 U.S.App.D.C. at 3, 336 F.2d at 922.

On remand, the Commission obliged, setting forth precise pleading requirements calling for an analysis of the existing station's economic base in terms of specifically delineated market criteria. *See* Missouri-Illinois Broadcasting Co., 3 Pike & Fischer R.R.2d 232 (1964). The Commission cautioned the industry that at a minimum it would demand allegations of fact related to the "economics of broadcasting" which are sufficient to raise a substantial doubt concerning the ability of the particular locality to support another station without detriment to public service. Stated generally,[26] *Mis-*

---

24. *See, e. g.*, Bigbee Broadcasting Co., 24 Pike & Fischer R.R. 497 (1962); Haggard & Rogers, 24 Pike & Fischer R.R. 670 (1962), in which the Commission apparently continued to apply the liberal pleading rule it had adopted prior to the 1960 amendment.

25. *See, e. g.*, Rhinelander Television Cable Corp., 37 F.C.C. 1071, 3 Pike & Fischer R.R.2d 1014 (1964); KTBS, Inc., 25 Pike & Fischer R.R. 301 (1963); Tree Broadcasting Co., 1 Pike & Fischer R.R. 2d 15 (1963); Tri-Cities Broadcasting Co., 24 Pike & Fischer R.R. 691 (1962).

26. The Commission required all petitioners to submit data on the following questions:
    (1) What is the total amount of retail sales in the community and the area for the preceding three years? If sales are in a decreasing pattern, set forth the reasons which should include information as to any unusual economic conditions in the area.
    (2) What is the total number of businesses in the community and the area?
    (3) What is the total advertising revenue potential in the community and the area?
    (4) What is the amount of local advertising revenue actually earned by our [*sic*] station in the community and the area?
    (5) Set forth, for at least the three preceding years, your total revenues,

total expenses, net profit or loss and the average number of employees.
    (6) How many of the existing businesses in the community and the area do not now advertise on the radio?
    (7) State, in detail, the specific advertisers that would shift their advertising to the proposed station. How many advertisers will split their advertising time between the existing station or stations and the proposed station?
    (8) What are the other competing advertising media in the community and the area?
    (9) State, in detail, how a grant of this proposal would cause a net loss or degredation of program service to the area.
    (a) What public service programs do you now broadcast?
    (b) How many public service spot announcements do you broadcast each week?
    (c) What public service programs would have to be discontinued? spot announcements?
    (d) What public service programs will have to be shifted to other time segments? spot announcements?
    (e) As to (c) and (d) what percentage of the total broadcast time is represented by the public service programming?
    (f) What is the cost of carrying these programs and what saving will

*souri-Illinois* demanded an analysis of the area's total advertising revenue potential and a description of the competing advertising media. In addition, the decision called for a description of the nature and cost of the petitioner's public service programming and the relationship of such programming to its revenue potential. Such information was deemed essential for the Commission to make reasoned judgments as to the need for full-scale evidentiary hearings on the *Carroll* question.

The Commission's rigid application of its *Missouri-Illinois* pleading rules went too far, however, and soon led to a virtual extinction of the right to a hearing on this issue.[27] Indeed, with the lone exception of *Missouri-Illinois* itself,[28] the Commission during this period denied every petition for a *Carroll* hearing. It was therefore apparent that although "Congress intended to vest in the [Commission] a large discretion to avoid time-consuming hearings in this field whenever possible,"[29] the Commission had clearly abused this discretion and the time for judicial intervention was ripe.

> be effected in dropping or shifting this programming? What is the cost of carrying the public service spot announcements and what saving will be effected in dropping or shifting spot announcements? What programming personnel changes will be required?
> (10) What information, if any, do you have that some or all of the public service programming will not be carried by the proposed station?
> (11) Will a grant of the proposal require you to make substantial changes in your total present program format and policies? State full details.
> (12) Set forth any other information which is sufficiently related to the economics of broadcasting, including the specific relationship between any assumed losses in revenue to the withdrawal of particular programs or program services in support of the question raised in petition to deny concerning the inability of the area to support another broadcast station without loss or degradation of program service to the area.
>
> 3 Pike & Fischer R.R.2d at 235–236.

The first instance of this intervention occurred in Southwestern Operating Co. v. F. C. C., *supra*, where this court held that although the Commission may insist on more than general and conclusory allegations, it may not use its pleading requirements as a means to justify complete disregard of the record actually placed before it. In reversing the Commission's denial of a hearing, the court ruled that a petitioner's failure to comply with the *Missouri-Illinois* standards is not in and of itself conclusive. Rather, "[t]he question remains one of whether the papers filed with the Commission—not those that might have been filed—raised substantial and material issues of fact which should have been exposed to the give-and-take of an evidentiary hearing." 122 U.S.App.D.C. at 140, 351 F.2d at 837.

The court in *Southwestern* did not, however, intend in any sense to overrule or forbid continued use of the Commission's pleading rules. The court explicitly recognized that since competition in broadcasting occupies a most favored position,[30] "the temptation to an exist-

27. *See, e. g.,* Voice of Middlebury, 3 F.C.C. 2d 512, 7 Pike & Fischer R.R.2d 347, reconsideration denied, 4 F.C.C.2d 995 (1966); WFTL Broadcasting Co., 1 F.C.C.2d 567, 5 Pike & Fischer R.R.2d 710 (1965); M. R. Lankford Broadcasting Co., 5 Pike & Fischer R.R.2d 459, reconsideration denied, 6 Pike & Fischer R.R.2d 100 (1965); Holder, Swidler & Swidler, 4 Pike & Fischer R.R.2d 639 (1965); Verne M. Miller, 2 Pike & Fischer R.R.2d 813 (1964); Radio Chippewa, Inc., 2 Pike & Fischer R.R.2d 474 (1964).

28. 5 Pike & Fischer R.R.2d 452 (1965).

29. Southwestern Operating Co. v. F.C.C., 122 U.S.App.D.C. 137, 138, 351 F.2d 834, 835 (1965). *See, e. g.,* Folkways Broadcasting Co. v. F.C.C., 126 U.S.App. D.C. 123, 375 F.2d 299 (1967); TI Broadcasting Co. v. F.C.C., 126 U.S.App. D.C. 54, 374 F.2d 268 (1966); National Broadcasting Co. v. F.C.C., 124 U.S.App. D.C. 116, 362 F.2d 946 (1966); KGMO Radio-Television, Inc. v. F.C.C., 119 U.S. App.D.C. 1, 336 F.2d 920 (1964).

30. *See, e. g.,* F.C.C. v. Sanders Brothers Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940); West Geor-

ing licensee to postpone as long as possible the advent of competition warrants special care by the Commission in the scrutiny of requests for hearing in *Carroll* circumstances." 122 U.S.App.D.C. at 138 n. 2, 351 F.2d at 835 n. 2. Moreover, the Commission's resources are strictly limited, and reasonable pleading requirements are therefore necessary to avoid unjustified delay and consumption of the Commission's time and energy.

With these considerations in mind, the court limited its holding, taking great pains to point out that its reversal of the Commission's order was predicated on certain special and unique features of the record before it.[31] Thus while the Commission must now temper its pleading rules with a reasonable degree of flexibility, the petitioner cannot be content to present only one side of the factual coin. The practical effect of *Southwestern* depends in large part on the particular circumstances of each individual case, and it remains incumbent upon the petitioner to plead specific factual data sufficient to establish a *prima facie* case of injury to the public to require a hearing.

The second important limitation on the Commission's pleading requirements arose out of this court's decision in Folkways Broadcasting Co. v. F. C. C., 126 U.S.App.D.C. 123, 375 F.2d 299 (1967). In the proceedings before the Commission,[32] the petitioner's request for hearing was denied, in part because he had failed to allege the particular advertisers that would be lost and the particular

public service programming that would have to be taken off the air as a consequence of the increased competition. This court reversed,[33] holding that "a *Carroll* hearing may not be limited to a case in which pre-knowledge of the exact economics of the situation is necessarily available. Requiring such precision would eliminate the doctrine as a practical matter." 126 U.S.App.D.C. at 127, 375 F.2d at 303.

The court admonished the Commission:

"* * * To require a specific advance showing that a particular program would be abandoned should the economic injury ensue would be to force an advance decision where some latitude should be left to management. The question is whether there would be degradation of public service resulting from the necessary abandonment of a program or programs within a range of programs some of which would have to be abandoned. Exposition of the matter by a hearing should not be denied simply because a petitioner has not specified the exact program the alleged loss would cause to be abandoned. So, too, as to possible loss of advertisers. Here a reasonable judgment by the licensee must be reached, supported in its reasonableness by a strong showing, but it need be only such a judgment, not an exact detail of facts—for example, not necessarily knowledge of specific advertising shifts."

gia Broadcasting Co., 23 F.C.C. 255, 14 Pike & Fischer R.R. 275 (1957) ; Southeastern Enterprises, 22 F.C.C. 605, 13 Pike & Fischer R.R. 139 (1957).

31. The court pointed specifically to two particularly unusual aspects of the record : (1) the applicant's unusual competitive position in the market due to its affiliation with another, geographically related, station, and (2) the nature of the proceedings themselves, which had become so complex that "the truth was becoming obscured, rather than revealed, by the mounting pile of papers." 122 U.S. App.D.C. at 138, 140–141, 351 F.2d at 835, 837–838.

32. Harriman Broadcasting Co., 2 F.C.C.2d 320, 6 Pike & Fischer R.R.2d 709 (1966).

33. In reversing the Commission's denial of a *Carroll* hearing, the court in *Folkways*, as in *Southwestern*, pointed specifically to certain unique features of the record that justified the petitioner's failure to meet the Commission's legitimate pleading rules. In *Folkways* the special aspects of the record relied on by the court involved the long delay in the proceedings and the alleged threat of a ruinous rate war. 126 U.S.App.D.C. at 127–128, 375 F.2d at 303–304.

126 U.S.App.D.C. at 128–129, 375 F.2d at 304–305.

The Commission's response to our decisions in *Southwestern* and *Folkways* has been commendable. The Commission has significantly modified its *Missouri-Illinois* requirements to eliminate the need for "pre-knowledge of the exact economics of the situation." [34] At the same time, however, it has continued to insist upon specific factual data rather than generalized and conclusory allegations of public injury. Thus the Commission still demands statistics as to the number of businesses in the area, total volume of retail sales, other advertising media, the number of area businesses which do not presently advertise, cost of public service programming, and other data related to the economics of broadcasting which may tend to show that the area involved could not support another station without loss or degradation of program service to the public. New Era Broadcasting Co., Inc., 16 F.C.C.2d 824, 15 Pike & Fischer R.R.2d 918 (1969); Cardinal Broadcasting Co., Inc., 11 F.C.C.2d 847, 12 Pike & Fischer R.R.2d 599 (1968). Such data is readily available to the petitioner and is indispensable if the Commission is to make informed judgments as to the need for full-scale evidentiary hearings. Moreover, the Commission has eliminated the rigidity with which these pleading rules had been applied in the past and, indeed, has incorporated a degree of flexibility in its procedures which is fully consonant with our holding in *Southwestern*. See, e. g., Tri-County Radio Co., Inc., 26 F.C.C.2d 147, 20 Pike & Fischer R.R.2d 460 (1970); DeWitt Radio, 17 F.C.C.2d 385, 16 Pike & Fischer R.R.2d 41 (1969). As a result, the Commission's policy in this area has for the first time achieved a reasonable balance among the numerous competing considerations involved, and this balance is amply reflected in the increasing number of cases that have been designated for *Carroll* hearings in recent years. [35] With the law in this posture, then, we confront the questions raised by appellant WLVA–TV on this appeal.

**B**

As is clear from the above discussion, a petitioner seeking a hearing on the *Carroll* issue must plead specific factual data sufficient to make out a *prima facie* case that the economic consequences of a grant of the challenged application will lead to an overall derogation of service to the public. Specifically, the petitioner must raise substantial and material questions of fact as to whether: (1) the revenue potential of the market is such that a grant will cause the petitioner to suffer a significant loss of income; (2) the effect of this loss will be to compel the petitioner to eliminate some or all of its public service programming; and (3) this loss of programming will not be offset by the increased non-network programming proposed to be offered by the applicant. Since these three aspects of the *Carroll* issue are essentially interdependent, a failure to satisfy any one of the three is likely to be dispositive of the petitioner's claim to a hearing.

In an effort to meet these requirements, WLVA–TV's pleadings incorporated by reference relevant portions of the evidentiary record compiled in the hearing on its own application for modification, but did not adduce any additional evidence directed specifically to the issue at hand. For reasons given

---

34. Folkways Broadcasting Co. v. F.C.C., *supra* note 29, 126 U.S.App.D.C. at 127, 375 F.2d at 303; *see, e. g.*, South Carolina Educational Television Com'n, 18 F.C.C.2d 328, 16 Pike & Fischer R.R.2d 725 (1969); Eastern California Broadcasting Corp., 13 Pike & Fischer R.R.2d 261 (1968); Little Dixie Radio, Inc., 11 Pike & Fischer R.R.2d 1083 (1967).

35. *See, e. g.*, Tri-County Radio Co., Inc., 26 F.C.C.2d 147, 20 Pike & Fischer R.R.2d 460 (1970); DeWitt Radio, 17 F.C.C.2d 385, 16 Pike & Fischer R.R.2d 41 (1969); New Era Broadcasting Co., Inc., 16 F.C.C.2d 824, 15 Pike & Fischer R.R.2d 918 (1969); Eastern California Broadcasting Corp., supra note 34.

below, we conclude that appellant failed to plead sufficient factual data to entitle it to a *Carroll* hearing.

■ We begin, then, with an analysis of the first aspect of the *Carroll* issue— whether a grant of WRFT–TV's application is likely adversely to affect WLVA–TV's long-run financial prospects.[36] In the typical *Carroll* situation —where the applicant and the petitioner are in direct competition for revenues— an improvement of the applicant's facilities will almost invariably lead to a shift in advertising income away from the petitioner and to the applicant. This is, of course, a natural consequence of the law of competition. The instant case, however, is somewhat atypical, for WRFT–TV and WLVA–TV apparently do not compete for local sources of advertising. WRFT–TV has limited its efforts in this regard to the Roanoke market, while WLVA–TV concentrates solely on Lynchburg advertisers.[37]

WLVA–TV contends, however, that although its local revenue sources may remain substantially unaffected by a grant of WRFT–TV's application, its competitive standing in the national and regional advertising markets may be seriously jeopardized. In essence, appellant argues that since WRFT–TV's proposed improvements will place duplicate network programming into approximately an additional 25 per cent of WLVA– TV's current Grade B coverage area, WLVA–TV will suffer a significant loss of audience which, in turn, will cause a freezing of WLVA–TV's network compensation and a reduction of national and regional advertising revenues.

■ Even if valid, however, such an argument is not, in and of itself, conclusive of the question of adverse economic impact. For even in the typical *Carroll* situation, the Commission must consider not only existing, but also future, competitive conditions. What may appear in the short run to be a substantial financial loss may often pale to insignificance when the overall revenue potential of the market is taken into account. Indeed, "under the impetus of competition, existing operations often increase their revenue." Tri-County Broadcasting Corp., 18 F.C.C.2d 751, 752 n. 1 (1969). It cannot simply be assumed that the market's capacity to generate income is essentially static and that any increased competition must inevitably result in a long-range reduction in income. Thus a mere showing of loss of *existing* sources of advertising does not, without more, raise a substantial

---

36. Somewhat related to this question is the problem of standing. To have standing under the Communications Act, the petitioner must be "a party in interest." 47 U.S.C. § 309(d) (1). Insofar as standing is based on economic injury, the party must show a direct and immediate injury and not merely nominal or speculative injury. National Broadcasting Co. v. F.C.C., 76 U.S.App.D.C. 238, 241, 132 F.2d 545, 548 (1942), *affirmed*, 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374 (1943). *See, e. g.,* Harriman Broadcasting Co., *supra* note 32, *reversed on other grounds, sub nom.* Folkways Broadcasting Co. v. F.C.C., *supra* note 29; Northco Microwave, Inc., 1 F.C.C.2d 350, 5 Pike & Fischer R.R.2d 641 (1965); National Broadcasting Co., Inc., 15 Pike & Fischer R.R. 965 (1957).
    Unlike the *Carroll* issue, however, a showing of private injury, without any public harm, is ordinarily sufficient to confer standing as a party in interest.

*See, e. g.,* Marlon U. Moore, 16 F.C.C.2d 351, 15 Pike & Fischer R.R.2d 495 (1969); Eugene Television, Inc. (KVAL– TV), 2 F.C.C.2d 706, 6 Pike & Fischer R.R.2d 911 (1966); Desert Telecasting Co., Inc. (KBLU-TV), 2 F.C.C.2d 217, 6 Pike & Fischer R.R.2d 691 (1965). Thus where a competitor of the applicant seeks to intervene, standing is liberally conferred. *See, e. g.,* Big Basin Radio, 10 F.C.C.2d 209, 11 Pike & Fischer R.R. 2d 368 (1967); Voice of Middlebury, *supra* note 27. Where a non-competitor asserts economic injury as a basis for standing, however, the problem has traditionally been more troublesome. *See, e. g.,* Lester & Alice Garrison, 6 F.C.C. 2d 270, 9 Pike & Fischer R.R.2d 241 (1967); Tuschman Broadcasting Corp., 3 Pike & Fischer R.R.2d 712 (1964).

37. Transcript of hearing, In re Application of WLVA, Inc., *supra* note 8, JA 9–10; Waller Testimony, JA 20–21.

and material question of fact as to adverse economic impact.

■ This does not mean, of course, that the Commission may limit *Carroll* hearings to only those cases in which "pre-knowledge of the exact economics of the situation is necessarily available." Such a restriction was explicitly rejected by this court in *Folkways*.[38] Rather, the petitioner must plead sufficient statistical data to enable the Commission to make an informed judgment as to the overall market revenue potential. Typically, such data includes information concerning the number of businesses in the area, total volume of retail sales, other advertising media, and other data related to the economics of broadcasting. New Era Broadcasting Co., Inc., *supra*; Cardinal Broadcasting Co., Inc., *supra*. Moreover, since WLVA–TV's claims here hinge primarily on national and regional advertising considerations, detailed factual data relating to these sources of revenue would be particularly relevant in the present context.

■ Appellant, however, has failed almost entirely to provide meaningful statistical information concerning the revenue potential of the Roanoke-Lynchburg market.[39] Instead, relying upon our decision in *Southwestern*, appellant apparently contends that because of certain unique features of this controversy it need not fulfull the Commission's pleading requirements in order to make out a *prima facie* case on this aspect of the *Carroll* issue. Specifically, WLVA–TV asserts that a grant of WRFT–TV's application is likely to cause a perforation of the Roanoke-Lynchburg television

market. That is, Roanoke and Lynchburg would for the first time be considered as separate markets by national and regional advertisers. Under such circumstances, Lynchburg would no longer constitute part of the nation's 67th largest market and would fall to the level of 122nd in market size. Were this to occur, WLVA–TV would allegedly lose much of its national and regional advertising revenue and would therefore suffer extraordinary and irrevocable financial hardship.[40]

We do not doubt that in some instances a specific and reasonably substantiated fear of perforation may obviate the need for a petitioner to satisfy completely the Commission's usual pleading rules. This is not, however, such a case. Appellant's allegation of perforation is premised solely on the testimony of Martin E. Goldberg, a sales representative for WLVA–TV.[41] Mr. Goldberg's testimony, however, is itself predicated on a series of key assumptions [42] which appellant has made no effort to substantiate. For example, although the Commission has repeatedly recognized that a station whose service is duplicated by signals of an inferior grade has a substantial edge in competing for viewers in the duplicated area,[43] WLVA–TV simply *assumes* that a grant of WRFT–TV's application will cause it to suffer a major loss of audience. This assumption is crucial to appellant's perforation argument, yet no evidence was presented to demonstrate that WRFT–TV's UHF signal would be technically equal or superior to appellant's own VHF signal in the

**38.** 126 U.S.App.D.C. at 127, 375 F.2d at 303; see, e. g., South Carolina Educational Television Com'n, *supra* note 34; Eastern California Broadcasting Corp., *supra* note 34; Little Dixie Radio, Inc., *supra* note 34.

**39.** Indeed, the only meaningful data actually furnished by appellant reveals a history of increasing revenues in the Roanoke-Lynchburg market. *See* note 10 *supra*.

**40.** Goldberg Testimony, JA 40; transcript of hearing, In re Application of WLVA, Inc., *supra* note 8, JA 10–13.

**41.** *Ibid.*

**42.** JA 11–13.

**43.** *See, e. g.*, First Report and Order on CATV, 38 F.C.C. 863 (1965); Second Report and Order on CATV, 2 F.C.C.2d 725, 6 Pike & Fischer R.R.2d 1717 (1966); Triangle Publications, Inc., 37 F.C.C. 307, 3 Pike & Fischer R.R.2d 37 (1964).

area of overlap.[44] In the absence of such evidence, WLVA–TV can hardly be said to have made out a *prima facie* case of perforation.

■ Even if we were to accept as valid appellant's claim that a grant would lead to a reduction in its viewing audience, the question remains whether national and regional advertisers would be likely to desert WLVA–TV in favor of an expanded, yet still less powerful, WRFT–TV. Although appellant need not, of course, predict with certainty the particular advertising shifts it fears, it must establish by a "strong showing" the reasonableness of its allegations. *Folkways, supra,* 126 U.S.App.D.C. at 129, 375 F.2d at 305. And such a showing is particularly critical here, since even if the challenged application is granted it is clear that WLVA–TV will continue to command a considerably larger audience than its UHF competitor.[45] Appellant, however, simply assumes that a loss of audience will inevitably cause its national and regional advertisers to switch to WRFT–TV; it offers no corroborating evidence whatever.[46] We therefore conclude, as did the Commission, that appellant has failed to plead specific factual data sufficient to raise a substantial and material question as to the likelihood that a grant of WRFT–TV's application will cause WLVA–TV to suffer a significant loss of income.

■ Moreover, even if appellant had satisfied this requirement it still would not be entitled to a hearing, for it failed also to establish a *prima facie* case as to the second aspect of the *Carroll* issue—that the adverse economic impact of a grant is likely to compel WLVA–TV to eliminate some or all of its public service programming.[47] The inquiry here shifts from the general market structure to the particular nature of appellant's own operation. Two considerations are paramount in this regard—the projected financial status of appellant if the application is granted, and the nature and cost of appellant's present and proposed non-network programming.

■ In the instant case WLVA–TV has presented no evidence concerning the cost of its public service programming.[48] In the absence of such data, it is virtually impossible for either this court or the Commission to determine with any reasonable degree of certitude whether the alleged adverse economic effects of a grant of WRFT–TV's application are likely to cause a deterioration in the quality of appellant's service to the public. As a result, a failure to plead such information will in most cases justify denial of a hearing on the *Carroll* issue.

Relying once again upon our decision in *Southwestern*, however, WLVA–TV contends that because of its "marginal" financial position any loss of revenue caused by a grant will necessarily re-

---

44. Although there was testimony to the effect that "WRFT-TV would have a competitively equal chance to deliver . . . duplicated homes," this testimony was directed to gain areas in which the WRFT-TV signal would be equal or superior to the WLVA–TV signal. *See* "Opposition to 'Petition in Support of Application or in the Alternative Petition to Deny,' " at n. 8, JA 57–58.

45. *See* Initial Decision at ¶¶ 11–24, 45–51, JA 67–73, 80–82.

46. Mr. Goldberg admitted, for example, that in formulating his opinion he neither interviewed any of WLVA–TV's national or regional advertisers nor caused any engineering studies to be conducted. *See* transcript of hearing, In re Application of WLVA, Inc., *supra* note 8, JA 13–14.

47. Since the 3 aspects of the *Carroll* issue are essentially interdependent, WLVA–TV's failure to satisfy the first component of course renders it impossible for it to satisfy the second. For the sake of discussion, however, the following analysis assumes *arguendo* that appellant succeeded in raising a question as to adverse economic impact.

48. As noted by the Commission, although the record does contain a figure for total program expenses, that figure includes expenses for all categories of programming and therefore sheds no light on the cost of appellant's non-network programming. *See* 25 F.C.C.2d at 455 n. 4, 20 Pike & Fischer R.R.2d at 75 n. 4.

quire it to cut back on its public service programming. Data relating to the cost of such programming, appellant asserts, is therefore immaterial. Although we agree in principle with this argument, an analysis of WLVA–TV's financial picture reveals that the instant case simply does not fall within the principle espoused.

Prior to its acquisition by the Evening Star Broadcasting Company in 1965, appellant operated at a slight yet respectable profit. In 1966, however, the Evening Star commenced an intensive drive to upgrade the station's facilities and to improve its programming. Since that time, some $400,000 has been devoted to these purposes and operating costs between 1966 and 1967 were increased by $350,000 per year.[49] Consequently, WLVA–TV in 1966 suffered a net operating loss of $148,408, with a cash flow loss of $16,274; the corresponding losses for 1967 were $164,323 and $19,228. Throughout this period, however, WLVA–TV's gross earnings continued to climb,[50] and appellant's cash flow has gradually increased from a negative $19,-228 in 1967 to a positive $48,677 in 1968 and 9.1 per cent of revenues in 1969.[51]

On the basis of these statistics, the Commission rejected appellant's plea of poverty[52] and found, to the contrary, that the station was "financially sound."[53] In view of this finding, which clearly was reasonable under the circumstances,[54] we conclude that appellant's pleadings were insufficient to raise a substantial and material question of fact as to whether a grant of WRFT–TV's application is likely to cause a deterioration of WLVA–TV's public service programming.[55]

Finally, since appellant has failed to satisfy both the first and second aspects of *Carroll*, either of which failure is sufficient to dispose of its petition, we need not consider WLVA–TV's showing under the third component—that the petitioner's loss of public service programming will not be offset by the increased programming proposed to be offered by the applicant. We therefore affirm the Commission's denial of appellant's request for a hearing on the *Carroll* issue.

49. Initial Decision at ¶ 7, JA 65.

50. WLVA-TV's share of the total broadcast revenues for the Roanoke-Lynchburg market was $517,555 in 1967; $432,097 in 1966; and $427,572 in 1965. Waller Testimony, JA 16; Initial Decision at ¶ 7, JA 65.

51. *See* text at note 12 *supra*.

52. To support its plea of poverty and its claim that any loss of income will result in elimination of at least some public service programming, appellant alleged that even under existing competitive conditions it became necessary to curtail segments of the expanded programming service initiated by the Evening Star in 1965. However, according to the testimony actually adduced, it is not clear whether these changes were made for economic reasons or merely "due to lack of audience acceptance." Moreover, the changes were only temporary. Waller Testimony, JA 7–8.

53. 25 F.C.C.2d at 456, 20 Pike & Fischer R.R.2d at 76.

54. Under the Administrative Procedure Act, 5 U.S.C. § 706 (1970), courts must "hold unlawful and set aside agency action * * * found to be * * * arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Although the exact bounds of the concept of arbitrary and capricious administrative action are not precisely defined in the Act, it is well settled that the core of the concept is the notion of rationality. *See, e. g.*, Columbia Broadcasting System, Inc. v. F.C.C., 147 U.S.App. D.C. 175, 185 n. 66, 454 F.2d 1018, 1028 n. 66 (1971) and cases cited therein.

55. As a word of caution, however, we note that where a petitioner raises a substantial and material question as to adverse economic impact and, further, presents detailed evidence as to the cost and nature of its non-network programming and current financial status, the Commission may not dispose of the petition simply by finding the station *presently* to be "financially sound." Rather, in such a situation a careful analysis is necessary to determine whether the economic effects of a grant are likely to cause the petitioner to eliminate some or all of its public service programming.

## III

Relying upon the Supreme Court's landmark decision in Ashbacker Radio Corp. v. F. C. C., 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1946), appellant WLVA–TV contends further on this appeal that the Commission erred in denying its petition for consolidated comparative consideration of both its own and WRFT–TV's applications. Since its inception, the *Ashbacker* doctrine that parties making mutually exclusive applications are entitled to comparative hearings has grown rapidly, spreading far beyond the communications field where it originated.[56] Indeed, *Ashbacker* and its progeny represent perhaps the most important series of cases in American administrative law. Citizens Communication Center v. F. C. C., 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971).

Under Section 309 of the Communications Act, an applicant has a statutory right to a hearing before denial of his application by the Commission. The primary question in *Ashbacker* was whether this right is violated where the Commission, having before it two applications which are mutually exclusive, grants one without a hearing and sets the other for hearing. Faced with two "actually exclusive" applications, the Commission had granted that of the Fetzer Broadcasting Company, while at the same time designating the Ashbacker Radio Corporation application for hearing. Contrary to Ashbacker's claim that such a procedure would render the hearing on its own application a useless formality, the Commission asserted that Ashbacker would have ample opportunity to show that its operation would better serve the public interest than would grant of the Fetzer application and that the Fetzer grant did not preclude the

Commission, at a later date, from taking any action which it found to be in the public interest.

The crux of the Supreme Court's opinion lies in its determination that this arrangement did not furnish the type of hearing that Congress had provided Ashbacker as a matter of right. Congress had intended the Section 309 hearing to be on the merits of the application, but the Commission, by its administrative action, changed the character of the hearing so that it became one for revocation of an established license. The Court therefore held that "if the grant of one [application] effectively precludes the other, the statutory right to a hearing * * * becomes an empty thing. * * * We only hold that where two *bona fide* applications are mutually exclusive the grant of one without a hearing to both deprives the loser of the opportunity which Congress chose to give him." 326 U.S. at 330, 333, 66 S.Ct. at 150, 151.

■■■ In the instant case, appellant initially adopted the position that the applications involved are not mutually exclusive and, indeed, argued that both should be granted because "there is sufficient new audience and derivative revenues available in the gain areas * * * to enable both WRFT–TV and WLVA–TV to compete effectively."[57] After issuance of the hearing examiner's initial decision denying the WLVA–TV application, however, appellant filed with the Commission a petition requesting consolidation of consideration of WRFT–TV's application with its own on the ground of alleged economic mutual exclusivity.[58] This change of heart apparently was prompted by the examiner's finding that, because of the structure of the Roanoke-Lynchburg television market, "there is a realistic possibility that a

56. *See, e. g.*, Pollack v. Simonson, 121 U.S. App.D.C. 362, 350 F.2d 740 (1965); Northeastern Gas Transmission Co. v. F.P.C., 3 Cir., 195 F.2d 872, *cert. denied*, 344 U.S. 818, 73 S.Ct. 13, 97 L.Ed. 637 (1952); Northwest Airlines v. C.A.B., 90 U.S.App.D.C. 158, 194 F.2d 339 (1952); Missouri-Kansas-Texas R. Co. v. Brother-

hood of Ry. & S.S. Clerks, 7 Cir., 188 F.2d 302 (1951). *See also* 1 K. Davis, Administrative Law Treatise § 8.12 (1958).

57. *See* brief for appellant at 30–31.

58. JA 92–95.

grant of the WLVA application would impair the ability of prospective UHF Station WRFT to compete effectively, and might jeopardize continuation of that station's service." [59] On this basis, WLVA–TV contends that since the market is insufficient to support expansion of both stations, a grant of WRFT–TV's application will effectively preclude its own.[60] Thus appellant concludes that an *Ashbacker* comparative hearing is necessary to determine which of the two applications would better serve the public interest.[61]

Although this analysis might at first blush appear somewhat appealing, the fatal flaw in appellant's approach lies in its failure even to consider the overriding impact of the Commission's long-standing UHF protection policy. This policy arose out of the Commission's realization that development of a viable system of UHF broadcasting, which was deemed essential in light of the limited number of available VHF channels, could never become a reality unless and until these UHF stations were offered some sort of protection against their generally more powerful VHF competitors.[62] Thus the Commission devised its UHF preference doctrine as a means to foster optimum conditions for the growth of UHF television.[63] The substance of this doctrine is manifested in the Commission's consistent refusal to grant applications of VHF stations to enlarge their coverage areas when the effect would be detrimental to present or prospective UHF development. *See, e. g.,* Triangle Publications, Inc. v. F. C. C., 110 U.S. App.D.C. 214, 291 F.2d 342 (1961); WCLY–TV, Inc., 16 F.C.C.2d 506, 15 Pike & Fischer R.R.2d 642 (1969).

Thus, in an effort to preserve a realistic potential for UHF growth, the Commission has made a judgment that where proposed VHF expansion is likely seriously to jeopardize the development of UHF broadcasting, the "paramount policy of fostering UHF service would more than offset the policy of encouraging VHF stations to provide the best possible service to the largest number of persons." Eagle Broadcasting Co., 20 F.C.C.2d 233, 234, 17 Pike & Fischer R.R.2d 766, 769 (1969); Gala Broadcasting Co., 13 Pike & Fischer R.R. 2d 103 (1968). Adoption of such an approach is clearly within the Commission's discretion, for it is well settled that "[i]t is for the Commission, not the courts, to pass on the wisdom of the channel allocation scheme," Coastal Bend Television Co. v. F. C. C., 98 U.S.App.D.C.

---

59. Initial Decision at ¶ 50, JA 82.

60. This is not, of course, the classical case of mutual exclusivity, for based on the examiner's findings it is apparent that, although a grant of the WRFT-TV application may preclude appellant's application, the converse is not necessarily true. However, to satisfy the requirements of *Ashbacker* the claimant need not show complete exclusivity, but only that a grant of the competing application is likely to affect substantially the outcome of its own application. *See, e. g.,* Great Western Packers Express, Inc. v. United States, D.Colo., 263 F.Supp. 347 (1966); El Paso Natural Gas Co., 27 F.P.C. 984 (1962); Dallas to the West Service Case, 30 C.A.B. 44 (1958). *See also* 47 C.F.R. § 1.227 (1971).

61. *See* Johnston Broadcasting Co. v. F.C.C., 85 U.S.App.D.C. 40, 45–46, 175 F.2d 351, 356–357 (1949), for a discussion of the relevant factors to be considered at such a hearing.

62. The disadvantages of UHF transmission may be summarized as follows: (1) with a given antenna height and power, a VHF signal reaches a considerably greater distance than a UHF signal; (2) a set capable of receiving both VHF and UHF transmission is more expensive than one geared only to VHF transmission; and (3) somewhat different antenna characteristics are required to receive the two types of transmission. Coastal Bend Television Co. v. F.C.C., 98 U.S.App.D.C. 251, 253, 234 F.2d 686, 688 (1956).

63. *See, e. g.,* South Carolina Educational Television Com'n, *supra* note 34; Selma Television, Inc., 12 F.C.C.2d 781, 12 Pike & Fischer R.R.2d 1082 (1968); Central Coast Television, 14 F.C.C.2d 985, 14 Pike & Fischer R.R.2d 575 (1968); Triangle Publications, Inc., *supra* note 43.

**1304**

251, 255, 234 F.2d 686, 690 (1956); *see also* National Broadcasting Co. v. United States, 319 U.S. 190, 224–225, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), and so long as the Commission's action in this area is reasonable, it must be upheld. *See, e. g.,* N. L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953); S. E. C. v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

■ In the present controversy, then, the ultimate success or failure of WLVA–TV's application will depend not on whether WRFT–TV is permitted to improve its facilities but, rather, on the threat an expanded WLVA–TV might pose to development of UHF broadcasting in the Roanoke-Lynchburg market. Thus, should the Commission conclude that a grant of appellant's application is likely adversely to affect UHF growth, that application may properly be denied. And this is so regardless of whether WRFT–TV's application is granted, held in abeyance, consolidated in the hearing, or indeed never filed at all but exists only in a hypothetical sense, for the UHF impact issue must consider potential as well as actual UHF development. *Cf.* Midwest Television, Inc., 13 F.C.C.2d 478, 13 Pike & Fischer R.R.2d 698 (1968); Central Coast Television, 14 F.C.C.2d 985, 14 Pike & Fischer R.R.2d 575 (1968).

This being so, there is simply no need for comparative consideration of WLVA–TV's and WRFT–TV's applications. And although the Commission's reliance on its UHF protection policy in this context may to some extent be viewed as a limitation on *Ashbacker*, such a limitation is clearly reasonable. For it has long been recognized that "[i]n order to avoid repeated hearings on identical issues, [the Commission] has the power to establish general rules outlining certain policies." 560 Broadcast Corp. v. F. C. C., 135 U.S. App.D.C. 330, 331, 418 F.2d 1166, 1167 (1969). *See also* United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); 1 K. Davis, Administrative Law Treatise § 7.01

(1958). We therefore conclude that the Commission did not abuse its discretion in denying WLVA–TV's petition for consolidation.

■ Finally, and for the sake of clarity, we note that the situation would be quite different here had appellant succeeded in raising a *Carroll* issue. In such a case, the UHF preference doctrine would not be conclusive, for that doctrine is intended only to shield UHF stations against VHF expansion—it does not serve as a sword enabling UHF broadcasters to destroy existing VHF stations where the result would be an overall derogation of service to the public. Thus a conflict between the Commission's UHF and *Carroll* policies would exist, and this conflict could properly be resolved only in the context of a full comparative hearing on the two competing applications. Since WLVA–TV failed to raise a *Carroll* issue, however, such a conflict is not presented and we therefore affirm the Commission's order.

Affirmed.